NOTICE
Decision filed 07/26/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 180264

NO. 5-18-0264

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-902 |
| | ) | |
| ANTHONY FIRESTINE, | ) | Honorable |
| | ) | Stephen P. McGlynn, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Presiding Justice Overstreet and Justice Welch concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Anthony Firestine, was charged with several offenses in connection with an incident in which two of his brothers were shot. The defendant admitted to police that he shot one of his brothers in the foot. He also admitted firing five additional shots but told police that he did not know whether any of those bullets hit his other brother. He claimed that all six shots were intended as warning shots. The defendant filed a motion to suppress his statement to police, arguing that, after he invoked his right to counsel, the investigating officer continued to ask him questions. The St. Clair County circuit court granted the defendant's motion. The State appeals, arguing that the defendant made only a limited invocation of his right to counsel by stating, "I don't want to answer that question without my lawyer." We affirm.

¶ 2    The events leading to the defendant's arrest took place at the home of his brother, John. The defendant and his son, Mark, went to John's home to confront the defendant's brothers, John

and Joe. According to the defendant, Joe owed money to various family members, including him. During the encounter that took place, Joe was shot in the foot, and John was shot in the leg. Both the defendant and Mark were arrested in connection with these events.

¶ 3     During the early morning hours of July 5, 2016, Officer Jeffery Hartsoe questioned the defendant in custody. Officer Hartsoe provided the defendant with the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), both verbally and in writing. Officer Hartsoe then told the defendant that he was there because his brother Joe had been injured. He explained that other individuals had given him statements about how that happened. Officer Hartsoe told the defendant that he wanted to get his "side of the story" so that he would not have to "rely on only one person's side." The defendant indicated that he wanted to hear what others had said first. When asked why, he told Officer Hartsoe that he wanted to know what people were saying about him. The following exchange then took place:

"OFFICER HARTSOE: Did you shoot your brother, Joe, tonight?

THE DEFENDANT: Did I shoot him?

OFFICER HARTSOE: Mmm hmm.

THE DEFENDANT: No.

OFFICER HARTSOE: Did you shoot him in the foot?

THE DEFENDANT: I don't want to answer that question without my lawyer.

OFFICER HARTSOE: Okay. Did you shoot John?

THE DEFENDANT: Did I shoot John?

OFFICER HARTSOE: Mmm hmm.

THE DEFENDANT: Not that I know of."

¶ 4     Officer Hartsoe continued to question the defendant. He asked the defendant where he was that evening, and the defendant acknowledged that he went to John's house. Officer Hartsoe

then asked if his encounter there was good or bad, and the defendant indicated that it was bad. At this point, Officer Hartsoe said, "So tell me about the parts you do want to talk about." In response, the defendant said, "I'll talk about the whole thing."

¶ 5    The defendant then told Officer Hartsoe that he drove to the home of his brother, John, to confront John and Joe. He stated that he drove there in a truck owned by his son, Mark, but he claimed that Mark did not go with him. No one was home, so the defendant returned to Mark's truck to leave. He told Officer Hartsoe that, as he got into the truck to leave, his brother's truck pulled up behind him and three individuals got out of the truck—John, Joe, and an individual he did not know. According to the defendant, all three "charged" at him, and John struck him with a baseball bat. The defendant admitted that he retrieved a pistol from Mark's truck and fired the pistol. He told Officer Hartsoe that he did not fire at anyone in particular, explaining that he was only trying to scare them away.

¶ 6    At this point, Officer Hartsoe asked the defendant if his brothers and the other individual were armed. The defendant stated that he did not know because it was dark. The officer asked how many shots he fired, and the defendant indicated that he fired six shots. Officer Hartsoe said, "You said you fired all six shots. The first one you said you shot to let them know, 'Hey, I've got a gun.' What were the other five for?" In response, the defendant admitted that he shot Joe in the foot. Asked whether he also shot John in the leg, he stated that he did not know whether he hit John.

¶ 7    During the interview, the defendant also acknowledged that he demanded money from Joe. He explained that Joe owed him money. He denied that he went to John's house looking for a fight. Officer Hartsoe informed the defendant that his son, Mark, admitted to being at the scene. The defendant acknowledged that Mark was there, but he denied that Mark was involved in the confrontation.

¶ 8    The defendant was charged with three counts of aggravated battery (720 ILCS 5/12-3.05(e)(1), (f)(1) (West 2014)), one count of attempted armed robbery (*id.* §§ 8-4(a), 18-2(a)), one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and one count of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1)). Subsequently, the defendant filed a motion to suppress his statements to Officer Hartsoe. He alleged that he unequivocally invoked his right to counsel early in the interview but "the officer ignored his invocation, and continued questioning him as if had not invoked his right."

¶ 9    The court held a hearing on the motion in April 2018. Officer Hartsoe testified as to his recollections of his interview of the defendant, and a video recording of the interview was entered into evidence. Officer Hartsoe testified that he asked the defendant if he shot someone in the foot. Defense counsel asked him if he could remember the defendant's response. Officer Hartsoe replied, "Paraphrasing, it was somewhere around, 'I don't want to answer that question without a lawyer or attorney.' " He acknowledged that he continued to question the defendant immediately, and he acknowledged that he did so without asking the defendant for any clarification concerning his invocation of his right to counsel. Asked if he could recall what types of questions he asked, Officer Hartsoe replied, "Not specifically or verbatim. It would have been details about the rest of his day that evening." He noted that, at some point, he asked the defendant what he was willing to discuss and the defendant answered, "The whole thing." He testified that the defendant did not again request an attorney.

¶ 10   In announcing his ruling from the bench, the trial judge first noted that he had viewed the recording of the interview. He then noted that as soon as the officer "gets to the heart of what these allegations are of the shooting of a family member, it's very clear that the—the defendant is becoming increasingly uncomfortable with the questioning." The court found that the defendant clearly asserted his right to remain silent without the presence of counsel. He then

stated, "I believe the police officer just ignored it, he moved on. He stuck on the same things." The court therefore granted the motion to suppress. The court entered a written order to that effect the same day. The State filed a certificate of impairment and the instant appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017).

¶ 11     The fifth amendment to the United States Constitution protects any individual from being " 'compelled in any criminal case to be a witness against himself,' " a protection that is applicable during custodial interrogation by the police. *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting U.S. Const., amend. V, and citing *Miranda*, 384 U.S. at 460-61). In *Miranda*, the Supreme Court recognized that, due to the inherently coercive nature of custodial interrogation, procedural safeguards are necessary to protect the privilege against self-incrimination in that setting. *Id.* (citing *Miranda*, 384 U.S. at 444). The warnings required by *Miranda* are intended to ensure "that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* at 574.

¶ 12     Once a suspect invokes his right to counsel under *Miranda*, officers must stop questioning him until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (citing *Miranda*, 384 U.S. at 474). This allows the suspect to "control the time at which questioning occurs, *the subjects discussed*, and the duration of the interrogation." (Emphasis added.) *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

¶ 13     In *Edwards*, the Supreme Court held that, once a suspect in custody has invoked his right to counsel, all questioning must cease until counsel is present unless the suspect initiates further discussion. *Edwards*, 451 U.S. at 484-85. The Court explained that the right to counsel embodied in *Miranda* is sufficiently important that, once a suspect invokes that right, it warrants "the special protection of the knowing and intelligent waiver standard." *Id.* at 483. As such, the Court held that "a valid waiver of that right cannot be established by showing only that [the suspect]

responded to further police-initiated custodial interrogation." *Id.* at 484. This is a rigid " 'bright-line rule.' " *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (*per curiam*) (quoting *Solem v. Stumes*, 465 U.S. 638, 646 (1984)). It exists to prevent police officers from "badgering" a suspect or engaging in conduct designed to "wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (Rehnquist, J., joined by Burger, C.J., and White and O'Connor, JJ.), and *Fare v. Michael C.*, 442 U.S. 707, 719 (1979)).

¶ 14    However, the rigid bright-line rule of *Edwards* is applicable only if the suspect actually invokes his right to counsel. *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Smith*, 469 U.S. at 95). To do so, a suspect must express his desire for the presence of counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. If the suspect's statement "is ambiguous or equivocal *** in light of the circumstances," the *Edwards* rule does not apply, and the officers may continue questioning the suspect. *Id.* Whether a suspect has unambiguously invoked his right to counsel is an objective inquiry. *Id.*

¶ 15    Statements obtained in violation of *Miranda* and its progeny are presumptively nonvoluntary. As such, they may not be admitted into evidence. *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010). The State bears the burden of proving that a defendant's incriminating statements were voluntary. *People v. Quevedo*, 403 Ill. App. 3d 282, 291 (2010). Appellate review of a ruling on a motion to suppress evidence on the basis of a *Miranda* violation ordinarily involves a two-part standard of review. *Id.* at 292. We first review the trial court's factual findings to determine whether they are against the manifest weight of the evidence. We then review the court's determination as to whether suppression is warranted under a *de novo* standard of review. *Id.* In this case, however, the court relied on a video recording of

- 6 -

Officer Hartsoe's interview of the defendant, which this court has also viewed. Any discrepancies between that video and the officer's testimony more than a year later must be resolved in favor of what the video shows. *Id.* As such, there are no disputed facts, and our review is therefore *de novo*. See *Schuning*, 399 Ill. App. 3d at 1081.

¶ 16    In this case, there is no question that the defendant was given the warnings required by *Miranda*. There is no question that he unequivocally invoked his right to counsel. There is also no question that Officer Hartsoe continued to interrogate the defendant after he did so. The only question is the *scope* of the defendant's invocation of his right to counsel. As we stated previously, invoking the right to counsel under *Miranda* allows a suspect to control what subjects can be discussed during the interrogation. See *Mosley*, 423 U.S. at 103-04. Thus, courts recognize that a suspect may make a limited or selective invocation of his right to counsel. See, *e.g.*, *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987); *United States v. Soliz*, 129 F.3d 499, 503 (9th Cir. 1997), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895, 913 n.4 (9th Cir. 2001). The question in this case is whether a reasonable police officer should have understood the defendant's invocation of that right in this case to be limited to certain subjects and, if so, what those subjects were.

¶ 17    The State argues that, by using the phrase "that question," the defendant unambiguously made only a limited invocation of his right to counsel. In support of its position, the State relies heavily on the United States Supreme Court's decision in *Barrett*. We find *Barrett* distinguishable.

¶ 18    There, the defendant was taken into custody and advised of his *Miranda* rights. He told police that he was willing to talk to them but that he would not give any written statements. *Barrett*, 479 U.S. at 525. Officers did not begin interrogating the defendant until approximately half an hour later. Before beginning their interrogation, officers again read the warnings required

by *Miranda*. The defendant told them that he would not give a written statement unless his attorney was present, but he said that he had " 'no problem' " talking to them. *Id.* The defendant then offered a confession. *Id.*

¶ 19    The trial court denied the defendant's motion to suppress, and the defendant was subsequently convicted. *Id.* at 526. On appeal, the Connecticut Supreme Court reversed, finding that the defendant had clearly invoked his right to counsel and noting that " 'requests for counsel' " have not " 'been narrowly construed.' " *Id.* at 526-27 (quoting *State v. Barrett*, 495 A.2d 1044, 1049 (Conn. 1985)).

¶ 20    The United States Supreme Court disagreed. *Id.* at 527. The Court emphasized that the "fundamental purpose" of its holding in *Miranda* was to protect the right of a suspect to " 'choose between speech and silence' " during custodial interrogation. (Emphasis omitted.) *Id.* at 528 (quoting *Miranda*, 384 U.S. at 469). The Court explained:

> "[W]e know of no constitutional objective that would be served by suppression in this case. It is undisputed that Barrett desired the presence of counsel before making a written statement. Had the police obtained such a statement without meeting the waiver standards of *Edwards*, it would clearly be inadmissible. Barrett's limited requests for counsel, however, were *accompanied by affirmative announcements of his willingness to speak with the authorities.*" (Emphasis added.) *Id.* at 529.

¶ 21    The Court went on to address the Connecticut Supreme Court's reliance on the principle that requests for counsel should not be interpreted narrowly. *Id.* Significantly for our purposes, the Court reaffirmed the principle that a suspect's request for counsel should be given " 'a broad, rather than a narrow, interpretation.' " *Id.* (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986)). The Court found, however, that under the facts before it, finding that the defendant had "invoked his right to counsel for all purposes" would require "not a broad interpretation of an

ambiguous statement, but a disregard of the ordinary meaning of [the defendant's] statement." *Id.* at 529-30.

¶ 22    Here, unlike in *Barrett*, the defendant's invocation of his right to counsel was not accompanied by an affirmative statement that there were any topics he was willing to discuss. Because there was no room to doubt that the defendant in *Barrett* was willing to waive his right to counsel and speak to police as long as he did not have to give a written statement, the Court did not have to provide any guidance for determining the scope of requests for counsel that are more nuanced.

¶ 23    The State, however, argues that the "ordinary meaning" of the language used by the defendant was as unambiguous as that of the defendant in *Barrett*. As noted previously, the State focuses on the phrase "that question." We find this argument flawed for two reasons.

¶ 24    First, the State's argument requires us to ignore the circumstances under which the defendant invoked his right to counsel. The defendant refused to answer the first question he was asked about the incident in which his brothers were shot. Under these circumstances, we believe it should have been clear to a reasonable police officer that he did not wish to discuss that incident further without an attorney. To overlook this circumstance would be at odds with our precedent. See, *e.g.*, *Davis*, 512 U.S. at 459 (explaining that the bright-line rule of *Edwards* does not apply if a suspect's request for counsel "is ambiguous or equivocal *** *in light of the circumstances*" (emphasis added)); *People v. St. Pierre*, 122 Ill. 2d 95, 111 (1988) (holding that a defendant's statement, "when considered in the entirety of the circumstances that preceded it, cannot be viewed as anything other than an unambiguous invocation of his right to counsel"); *Quevedo*, 403 Ill. App. 3d at 293-94 (concluding that the defendant did not make an unequivocal request for counsel when "[v]iewing defendant's statements in context"); *Schuning*, 399 Ill. App.

3d at 1089 (expressly refusing to ignore the circumstances under which the defendant made his request for counsel).

¶ 25    The second problem with the State's argument is that, if the defendant's invocation of his right to counsel is viewed as a limited invocation of that important right, it is not clear what the limits are. As we noted earlier, one purpose of the rules of *Miranda* and *Edwards* is to allow suspects to control the subjects they are willing to discuss with police. See *Mosley*, 423 U.S. at 103-04. It is unclear in this case what subjects the State views the defendant's request for counsel as placing off limits—questions about shooting, only questions about shooting Joe, or only questions about shooting Joe in the foot.

¶ 26    This brings us to the second case relied upon by the State, *Burrell v. Commonwealth*, 710 S.E.2d 509 (Va. Ct. App. 2011). The State acknowledges that this Virginia decision is not binding on this court, but it argues that *Burrell* is persuasive. We find *Burrell* distinguishable, and we do not find its rationale persuasive.

¶ 27    There, the defendant was questioned about cocaine found in the bedroom of a home he shared with his girlfriend. Before questioning him, the investigating officer read the defendant his *Miranda* rights. *Id.* at 512. The defendant answered questions about whether he lived in the house and which bedroom he used. *Id.* The officer then asked the defendant whether the cocaine found in the bedroom belonged to him. At this point, the defendant told the officer that he did not want to answer " 'certain questions' " without an attorney. *Id.* The officer asked the defendant whether this meant that he did not want to speak to him at all without an attorney, to which the defendant " 'stated no, there was just certain questions he didn't want to answer.' " *Id.*

¶ 28    The officer continued the interrogation. He asked the defendant for his girlfriend's phone number, explaining that he would need to question her about the cocaine. The defendant then confessed that it was his cocaine. *Id.* The officer once more asked the defendant if he was sure he

wanted to answer questions without an attorney. The defendant again stated that he did, and he repeated that the cocaine belonged to him. *Id.* He also admitted that a digital scale found in the home belonged to him. *Id.* at 513. However, he denied selling cocaine, and he denied lying to protect his girlfriend. *Id.* at 512-13. The defendant filed a motion to suppress these statements, which the trial court denied. *Id.* at 513.

¶ 29    On appeal from that ruling, a Virginia appellate court first noted that, if a suspect makes a request for counsel that is limited or qualified, police may continue to question him, but only "to the extent permitted by the qualification." *Id.* at 515 (citing *Barrett*, 479 U.S. 523). The court then noted that, in order to effectively invoke his right to counsel at all, a suspect must make a request for counsel that is "unambiguous and unequivocal." *Id.* (citing *Davis*, 512 U.S. at 458-60). The court reasoned that, in light of both of these principles, "when a suspect makes a qualified invocation by requesting the presence of counsel before answering certain kinds of questions, the qualification must also be unequivocal and unambiguous." *Id.* The court went on to explain that, in order to place an unequivocal and unambiguous qualification on a request for counsel, a suspect must express the limitation of his request sufficiently clearly "that a reasonable police officer would understand" that the suspect is "placing a specific question outside the boundaries of the interrogation." *Id.* at 516.

¶ 30    Applying this reasoning to the facts before it, the *Burrell* court noted that, although the defendant told police that there were "certain questions" he would not answer without the presence of counsel, he did not specify what those questions were. The court stated, "We cannot say that a reasonable police officer would have understood which questions Burrell had placed off limits." *Id.* The court found that his statement therefore indicated only that he "might, at some point in the future," refuse to answer specific questions. *Id.* The court concluded that the defendant's invocation of his right to counsel was, therefore, ineffective. *Id.* at 517.

¶ 31    We find that the instant case is different from *Burrell* in one significant respect. There, the defendant's invocation of his right to counsel was accompanied by an affirmative statement telling police that there were subjects he was willing to discuss without having an attorney present. Here, the defendant made no such affirmative statement when he invoked his right to counsel. Although the defendant later told Officer Hartsoe that he would talk about "the whole thing," he did so only in response to continued questioning after the officer ignored his request. Statements in response to further questioning after a request for counsel cannot be used "to cast doubt on the adequacy of the initial request." *Smith*, 469 U.S. at 98-99.

¶ 32    More fundamentally, however, we do not find the *Burrell* court's reasoning persuasive. Although we agree that a qualification or limit placed on an invocation of the right to counsel must be unambiguous (*Burrell*, 710 S.E.2d at 515), we disagree with the court's conclusion as to the effect of an ambiguous qualification on an unambiguous invocation of the right to counsel.

¶ 33    The primary problem with the *Burrell* court's approach is that it rendered the defendant's otherwise clear and unequivocal request for counsel completely ineffective. Under the court's holding, police were free to continue to question the defendant unless and until he reasserted his right. In essence, the court held that, if a qualification or limit on the invocation of the right to counsel is ambiguous, the invocation of the right is ineffective. We find that the better approach is to hold that, if a qualification or limit is ambiguous, the qualification or limit itself is ineffective. In other words, once a suspect unambiguously and unequivocally invokes his right to counsel, police must not question him concerning any matter unless the suspect has unambiguously and unequivocally placed that matter outside the scope of his invocation of his right to counsel. To hold otherwise would be at odds with the requirement that we interpret invocations of the right to counsel broadly. See *Barrett*, 479 U.S. at 529. In many cases, it would also render an important right illusive. In this case, the defendant unambiguously and

- 12 -

unequivocally invoked his right to counsel, and he did not clearly and unequivocally indicate that he was willing to discuss any particular topics without counsel's presence. Thus, Officer Hartsoe was required to stop the interrogation.

¶ 34    Finally, it is worth noting that, even if we were to accept the State's assertion that the defendant unambiguously made only a limited request for counsel, we would still find that Officer Hartsoe failed to honor his request. Contrary to what Officer Hartsoe testified nearly two years after the interrogation, the video shows that he did not merely go on to ask the defendant about "the rest of his day that evening." Instead, he immediately asked another question about the shooting. We do not consider the shooting of John to be a separate subject from the shooting of Joe because they were shot during the same incident. The fact that the officer did not change the subject was emphasized by the trial court in explaining its ruling. Moreover, Officer Hartsoe did not even refrain from asking again whether the defendant shot Joe. He asked, "What were the other five [bullets] for?" This question was clearly designed to elicit precisely the response it did—a statement that one of those bullets struck Joe in the foot. Because Officer Hartsoe did not honor the defendant's invocation of his right to counsel, the court correctly granted his motion to suppress.

¶ 35    For the foregoing reasons, we affirm the order granting the defendant's motion to suppress his statements to police.

¶ 36    Affirmed.

2019 IL App (5th) 180264

NO. 5-18-0264

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-902 |
| | ) | |
| ANTHONY FIRESTINE, | ) | Honorable |
| | ) | Stephen P. McGlynn, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

**Opinion Filed:**     July 26, 2019

_____

**Justices:**     Honorable Melissa A. Chapman, J.

        Honorable David K. Overstreet, P.J., and
        Honorable Thomas M. Welch, J.
        Concur

_____

**Attorneys**     Hon. Brendan F. Kelly, State's Attorney, St. Clair County, 10 Public
**for**     Square, Belleville, IL 62220; Patrick Delfino, Director, David J.
**Appellant**     Robinson, Deputy Director, Chelsea E. Kasten, Staff Attorney, Office of
        the State's Attorneys Appellate Prosecutor, 628 Columbus Street, Suite
        300, Ottawa, IL 61350

_____

**Attorneys**     William E. Carroll, Justin M. Whitton, 111 W. Washington Street,
**for**     Belleville, IL 62220
**Appellee**

_____