2023 IL App (4th) 220834

NO. 4-22-0834

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 7, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JAMES SYNOWIECKI, | ) | No. 20CF228 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices Turner and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant James Synowiecki was convicted of theft (720 ILCS 5/16-1(a)(1), (4) (West 2020)) and possession of a stolen firearm (*id.* § 24-3.8) and sentenced to five years in prison on each count, to be served concurrently. On appeal he argues (1) trial counsel provided ineffective assistance by failing to move to suppress inculpatory statements elicited by law enforcement in conversations initiated after counsel had been appointed, (2) the State failed to prove his theft conviction relating to the coin collection beyond a reasonable doubt, and (3) the trial court's order of restitution should be vacated because it was based on insufficient evidence.

¶ 2        We affirm in part, reverse in part, and remand for further proceedings on the issue of restitution.

¶ 3                                I. BACKGROUND

¶ 4        On Friday, September 4, 2020, defendant was charged by information with possession of methamphetamine (count I) (720 ILCS 646/60(a) (West 2020)), theft of a coin collection belonging to Edward Carstens (count II) (720 ILCS 5/16-1(a)(4) (West 2020)), possession of a stolen firearm (count III) (*id.* § 24-3.8), and theft of a Barbie doll collection belonging to Marilyn Weber (count IV) (*id.* § 16-1(a)(4). A docket entry from the same day shows that, at defendant's request, Livingston County public defender Scott Ripley was appointed to represent him "for [the] bond hearing only." A separate application for appointment of the public defender was also granted, and a written order appointing the public defender's office to represent defendant was entered later on September 4. The order states that the appointment was made "having heard the motion of defendant for appointment of counsel."

¶ 5        Defendant posted bond and was released on Tuesday, September 8, 2020. The following day, the public defender filed a notice that representation of defendant was assigned to attorney William H. Bertrand.

¶ 6                          A. Police Interview

¶ 7        Defendant first spoke to the police on the day of his arrest; however, no recording was made of that interrogation. On Friday, September 11, 2020, after he had been released on bond, defendant spoke with a Pontiac police officer concerning the theft of the shotgun. The record is unclear as to whether the police or defendant initiated the interview. At the outset of the interview, Pontiac Police Officer Markus Armstrong told defendant that he was not under arrest and that he was free to go at any time during the interview. Armstrong then read defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), stopping after each statement and waiting for defendant's acknowledgement, which was given. After reading defendant his *Miranda* warnings, defendant then signed what the State contends is a written release and waiver. That

document, however, is not included in the record. Defendant then proceeded to answer police questions; at no time during the interview did defendant request an attorney or exercise his right to remain silent. At the conclusion of the interview, defendant left the police station.

¶ 8                                B. Trial

¶ 9          Defendant's bench trial commenced in July 2021 and continued throughout the fall of that year. The following is a summary of the relevant testimony.

¶ 10          There had been a series of burglaries in Pontiac during the summer of 2020. Based on information received from witnesses, Pontiac Police Officer Markus Armstrong obtained a search warrant for defendant's residence, which he executed in early September with Officer John Marion. Present at the residence were defendant; his girlfriend, Erin Roff; Rocky Daniels; and another individual. The police recovered several of the items listed in their search warrant, including a coin collection, various dolls, and ammunition belonging to Carstens. The coin collection and some ammunition were found in defendant's basement, an area where Daniels lived. The dolls and other ammunition were located in a shed behind defendant's home reportedly used by Daniels.

¶ 11          Brenda Persico testified that, when she visited defendant's house, he offered and she accepted some of the Barbie dolls. According to Persico, who was familiar with the contents of the shed behind defendant's home, there was "more stuff in it than usual. Antiques and stuff like that." She said the shed was full of items and that defendant had told her he and Daniels had gotten the stuff "from a dumpster and they were just sort of going through it deciding what they wanted and didn't want." Persico said she heard defendant and Daniels talking about coins but did not offer any details.

¶ 12        A shotgun was later recovered from Patrick Roff, the father of defendant's girlfriend. Roff said that defendant had called him and asked him to come get the shotgun. According to Roff, defendant said "that someone had brought a shotgun to his house, and he didn't want it there." Defendant further told Roff that "[h]e did not know who brought [the shotgun] at the time," and he asked Roff to "come and get it because he had [my] daughter there and a baby." Defendant said, "there's people, you know, coming in and out of his house," and he did not "want anybody to be playing around with the gun." Roff went to defendant's house the next day and retrieved the gun from Daniels, who brought the gun out of the house and delivered it to Roff. Roff took the shotgun home and eventually surrendered it to police.

¶ 13        Armstrong said he interviewed defendant at the Livingston County Law and Justice Center on September 4, 2020, but this interview was not recorded. He again interviewed defendant on September 11 at the police department; the interview was recorded. Armstrong acknowledged that at no time during the interview did defendant admit that he took the shotgun or coin collection.

¶ 14        The video of defendant's September 11 police interview was admitted into evidence without objection and played for the trial court. During the interview, defendant said that Daniels had shown up at defendant's house with the shotgun and ammunition and that defendant did not know where they had come from. Defendant said that Daniels claimed he found them in an abandoned garage. Out of concern for his daughter and girlfriend, who lived in the house, defendant asked her father to come and get the shotgun. Defendant said he was suspicious when Daniels showed up with the coin collection; he had confronted Daniels about it because defendant did not believe that this type of item could be found through "dumpster diving." He also confirmed that the coin collection was located in his basement where Daniels was living. The ammunition was found in defendant's basement and in the shed.

¶ 15        Carstens confirmed that all of the items depicted in a photograph in evidence were items taken from his home. Carstens said he had started coin collecting after he retired in September 2001 and had spent somewhere around $50,000 on the collection. According to Carstens, he had a complete Indian Head penny collection, valued at approximately around $15,000; Morgan and Peace dollars; Susan B. Anthony dollars; several complete statehood quarter collections and Jefferson Nickel collections; and 300 Silver Eagle bullion coins. Although he did not pay more than $750 for any of the Silver Eagle coins individually, he testified that the price of silver had since skyrocketed. He also described three gold coins, which he valued at about $9000. Carstens confirmed that the collection and other items were taken from his home without his permission.

¶ 16                           C. Conviction and Sentence

¶ 17        Counts I and IV were dismissed by the State. However, defendant was convicted of theft (count II) and possession of a stolen firearm (count III) and was sentenced to five years' imprisonment on each count, to run concurrently. He was also ordered to pay restitution to Carstens in the amount of $33,650. His motion to reconsider his sentence was denied.

¶ 18        This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20        Defendant raises three issues following his conviction for theft: (1) ineffective assistance related to his counsel's failure to move to suppress a police interview conducted without his counsel present, (2) insufficiency of the evidence relating to his theft conviction, and (3) insufficiency of the evidence supporting the trial court's restitution order.

¶ 21                        A. Ineffective Assistance of Counsel

¶ 22    Defendant initially argues his counsel was ineffective because he did not move to suppress the police interview video. Defendant contends that the video was inadmissible because police interrogated him without counsel present, despite counsel having previously been appointed by the trial court on September 4, 2020.

¶ 23    Claims of ineffective assistance of counsel are analyzed under the familiar framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) defense counsel's performance was deficient and (2) but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different. *Id.* "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.*; *People v. Chandler*, 129 Ill. 2d 233, 242 (1989).

¶ 24    To establish prejudice based on defense counsel's failure to file a motion to suppress evidence, the defendant must show that (1) the motion was meritorious and (2) the outcome of the trial would have been different had the trial court suppressed the evidence. See *Henderson*, 2013 IL 114040, ¶ 15; *People v. Hayes*, 2021 IL App (1st) 172417, ¶ 78. Generally, a court will not find that defense counsel was ineffective for failing to file a motion to suppress. *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 21; see *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 54. " '[T]he decision whether to file a motion to suppress is generally "a matter of trial strategy, which is entitled to great deference." ' " *Rowell*, 2021 IL App (4th) 180819, ¶ 21 (quoting *People v. Peck*, 2017 IL App (4th) 160410, ¶ 29).

¶ 25    Thus, we must determine, based on this record, whether a motion to suppress would have had merit. To make that assessment, we must decide whether the conduct of the police in relation to the September 11, 2020, video violated defendant's sixth amendment right to counsel.

See U.S. Const., amend. VI. We review an ineffective assistance of counsel claim under a *de novo* standard of review. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 26                    1. *Right to Counsel Under the Sixth Amendment*

¶ 27          The sixth amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227-28 (1967)). It is well settled that a person's sixth amendment right to counsel "attaches after adversary judicial criminal proceedings have been initiated against him by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *People v. Ripplinger*, 316 Ill. App. 3d 1261, 1271 (2000) (citing *People v. Hunt*, 240 Ill. App. 3d 496, 502 (1992)); see *People v. Garrett*, 179 Ill. 2d 239, 247 (1997). Interrogation is likewise considered a critical stage. *Montejo*, 556 U.S. at 786.

¶ 28          However, the sixth amendment right to counsel may be waived by a defendant where the relinquishment of the right is "voluntary, knowing, and intelligent." *Patterson v. Illinois*, 487 U.S. 285, 292 (1988); *Brewer v. Williams*, 430 U.S. 387, 401, 404 (1977). In *Patterson*, the United States Supreme Court made it clear that a defendant "who is admonished with the warnings prescribed by this Court in *Miranda* [citation] has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296.

¶ 29          To be voluntary, "the waiver must not be 'the product of intimidation, coercion, or deception.' " *People v. Buschauer*, 2022 IL App (1st) 192472, ¶ 65 (quoting *People v. Soto*, 2017 IL App (1st) 140893, ¶ 68)). To be knowing, "the waiver must be 'made with a full awareness of the nature of the rights being waived and the resulting consequences of waiving those rights.' " *Id.* A *Miranda* waiver's validity depends on each case's circumstances and depends on a consideration

of factors "like the defendant's age, intelligence, background, mental capacity, education, and conduct." *Id.* A defendant may waive his sixth amendment right regardless of whether he is already represented by counsel; indeed, the decision to waive the right "need not itself be counseled." *Montejo*, 556 U.S. at 786.

¶ 30 With these constitutional principles in mind, we review the facts surrounding the September 11, 2020, police interview of defendant.

¶ 31                                    2. *This Case*

¶ 32 On appeal, defendant argues that his counsel was ineffective for failing to seek suppression of the interview video on the ground that it proceeded without appointed counsel's presence. According to defendant, the video's admission into evidence prejudiced him because, during the interview, he acknowledged he knew the coin collection was likely stolen. Defendant asserts that without the video, his conviction for theft of the coins could not stand and his conviction for possession of a stolen firearm would have been more difficult to prove.

¶ 33 The State argues that there cannot be ineffective assistance because the decision whether to file such a motion is a matter of trial strategy. It further argues that the motion to suppress, had it been filed, would have been denied because defendant voluntarily, knowingly, and intelligently waived his right to counsel after receiving his *Miranda* warnings. Finally, the State contends that, even without the interview video, there was sufficient evidence of defendant's guilt beyond a reasonable doubt.

¶ 34 In light of *Patterson* and *Montejo*, our inquiry here focuses on whether, after counsel was appointed at defendant's request, it was permissible for the police to speak with him without counsel present and, if so, whether defendant voluntarily, knowingly, and intelligently waived his sixth amendment right to counsel by waiving his *Miranda* rights prior to making his

recorded statements. Key to our inquiry is whether defendant's request for the appointment of counsel upon being charged constituted the invocation of his right to counsel such that the police were required to cease further contact with him.

¶ 35                a. Right to Counsel Attached on the Filing of the Information

¶ 36         At the outset, and based on this record, defendant's sixth amendment right to counsel attached on September 4, 2020, when he was arrested pursuant to the information. See *Ripplinger*, 316 Ill. App. 3d at 1271. Shortly thereafter, defendant was assigned counsel at his request. Both parties agree with this proposition.

¶ 37                b. Legal Effect of the Assignment of Counsel

¶ 38         Defendant argues that once the right to counsel attached and counsel was assigned, the police were prohibited from further contact with him without his attorney present. Defendant's argument effectively equates the assignment of counsel with an individual defendant's invocation of his right to counsel during a police interrogation; in other words because he was already assigned counsel, he did not need to further invoke his right to counsel in the September 11, 2020, interview. As we know, under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), "once a suspect in custody has invoked his right to counsel, all questioning must cease until counsel is present unless the suspect initiates further discussion." *People v. Firestine*, 2019 IL App (5th) 180264, ¶¶ 12-13. Defendant argues that any remarks made during the September 11 interview conducted without counsel should be suppressed.

¶ 39         We disagree that the assignment of counsel at his request is equivalent to a defendant's invocation of his right to counsel during interrogation. We understand defendant's concern here that his right to counsel not be undercut; indeed, *Edwards* establishes a "bright-line rule" "to prevent police officers from 'badgering' a suspect or engaging in conduct designed to

'wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " *Id.*; see *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (*per curiam*). However, the rigid bright-line rule of *Edwards* is applicable only if the suspect actually *invokes* his right to counsel in the interview. *Firestine*, 2019 IL App (5th) 180264, ¶¶ 14, 24-25, 33. *Edwards* does not support the proposition that once counsel is assigned, any further communication from law enforcement translates into a sixth amendment violation.

¶ 40 Defendant's argument may have once found support in the law, but no longer. In *Michigan v. Jackson*, 475 U.S. 625, 634-35 (1986), the United States Supreme Court held that a request for counsel at an arraignment should be treated as an invocation of a defendant's sixth amendment right to counsel such that any subsequent waiver would be "insufficient to justify police-initiated interrogations." However, *Jackson* was overruled in 2009 by *Montejo*, where the Court rejected the notion that "no *represented* defendant can ever be approached by the State and asked to consent to interrogation." (Emphasis in original.) *Montejo*, 556 U.S. at 789. The Court held that neither a defendant's request for counsel nor the appointment of counsel by a court gave rise to a presumption that a defendant's subsequent consent to police-initiated interrogation was invalid. *Id. Montejo* further held that "*Miranda* warnings adequately inform [a defendant] 'of his right to have counsel present during the questioning,' and make him 'aware of the consequences of a decision by him to waive his Sixth Amendment rights.' " *Id.* at 798-99 (quoting *Patterson*, 487 U.S. at 293)).

¶ 41 We conclude that neither the right to counsel, which attached at the filing of the information, nor the trial court's assignment of counsel precluded the police from subsequently contacting defendant for further interview. In such a situation, a defendant may choose to speak with the police without counsel present, provided he knowingly waives his right to counsel after

having his *Miranda* rights explained to him. See *Firestine*, 2019 IL App (5th) 180264, ¶ 13. Here, defendant gave no indication during his interview that he wished to exercise his right to counsel.

¶ 42                                c. Waiver of the Right to Counsel

¶ 43         Having concluded that the right to counsel must be unambiguously invoked in a subsequent interview even after counsel has been assigned, we next turn to the validity of the waiver itself. In *Patterson*, the Supreme Court held that the fact that a defendant's sixth amendment right to counsel arose with his indictment did not bar police from questioning a suspect where the defendant validly waived his right to counsel. *Patterson*, 487 U.S. at 291. As *Patterson* and *Montejo* observed, any waiver of the right to counsel must be voluntary, knowing, and intelligent. *Id.* at 292; *Montejo*, 556 U.S. at 786.

¶ 44         Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Because defendant voluntarily answered questions after the *Miranda* warnings were given without claiming his right to silence or to have his lawyer present to advise him during questioning, the specific issue posed here is whether this waiver was a "knowing and intelligent" waiver of his sixth amendment right. See *Patterson*, 487 U.S. at 292; *Williams*, 430 U.S. at 401, 404. As *Patterson* stated, the key inquiry in a case such as this one must be: "Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?" *Patterson*, 487 U.S. at 292-93.

¶ 45         According to *Patterson*,

"an accused who is admonished with the warnings prescribed by this Court in *Miranda* [citation] has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Id.* at 296.

Moreover,

" '[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.' "
*Id.* at 297 (quoting *Moran v. Burbine*, 475 U.S. 412, 422-23 (1986)).

¶ 46　　In examining the interview video in this case, Officer Armstrong began the interview by stating that the door was unlocked, defendant was not under arrest, and he was free to leave at any time. Armstrong then read defendant his *Miranda* rights, pausing after each statement to await defendant's acknowledgement, which was given by a nod. Following his reading of defendant's *Miranda* rights, defendant signed what was described as a written acknowledgement and waiver. At no time during the interview did defendant request his attorney or invoke his right to counsel as contemplated in *Edwards*. We further find nothing in the record suggesting that defendant was in any way compelled or pressured to conduct the interview.

¶ 47　　We conclude that the police complied with *Miranda* and provided defendant with a proper reading of his rights prior to the interview. Defendant acknowledged Officer Armstrong's reading of *Miranda* by nodding his head in agreement after each question and thereafter signed a written acknowledgement. Even though the record does not contain a copy of the written waiver, we note that any doubt arising from the insufficiency of the record will be resolved against the

appellant. *People v. Sechler*, 262 Ill. App. 3d 226, 227 (1994). The written waiver is, in any event, redundant to the conversation reflected on the video. Following the reading of his *Miranda* rights, defendant proceeded to answer questions and at no time made any request to speak with his attorney or terminate the interview. Defendant voluntarily and knowingly waived his right to counsel and chose to answer police questions.

¶ 48 Given our conclusions above, a motion to suppress would have been meritless. Moreover, we agree with the State that the failure to move to suppress was part of defense counsel's trial strategy to place the blame on Daniels; trial strategy is generally not subject to ineffective assistance claims and is entitled to great deference. *Rowell*, 2021 IL App (4th) 180819, ¶ 21; *Peck*, 2017 IL App (4th) 160410, ¶ 29. Accordingly, defendant cannot establish any deficiency in counsel's performance and cannot show prejudice as required by *Strickland*. Therefore, his ineffective assistance claim must fail.

¶ 49 B. Sufficiency of the Evidence—Theft of the Coin Collection

¶ 50 Defendant further contends that his conviction for theft should be set aside because the State failed to prove beyond a reasonable doubt that he committed a theft. Specifically, defendant argues that the State failed to prove that (1) he obtained or exercised control over the coin collection at issue and (2) the present cash market value of the coin collection was more than $10,000.

¶ 51 When the sufficiency of trial evidence is at issue, a court of review must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Eubanks*, 2019 IL 123525, ¶ 95 (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A trier of fact is not required to disregard inferences that flow normally

from the evidence before it, nor must it search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt. *Id.* (citing *People v. Campbell*, 146 Ill. 2d 363, 380 (1992)).

¶ 52 We now review defendant's claims in light of the standards enunciated in *Eubanks*.

¶ 53 1. *Control Over the Coin Collection*

¶ 54 Defendant first argues that the State failed to establish that he obtained or exerted control over the coin collection and, therefore, failed to prove theft. Under section 16-1(a)(4), a person commits theft when he knowingly "[o]btains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce him or her to believe that the property was stolen." 720 ILCS 5/16-1(a)(4) (West 2020).

¶ 55 In relation to property, " 'obtain' " means "to bring about a transfer of interest or possession, whether to the offender or to another." *Id.* § 15-7(a). Moreover, the phrase " 'obtains or exerts control' " over property "includes but is not limited to the taking, carrying away, or the sale, conveyance, or transfer of title to, or interest in, or *possession of property*." (Emphasis added.) *Id.* § 15-8. Additionally, "[k]nowledge" is defined as follows:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(a), (b).

¶ 56 Although defendant argues there is no evidence, circumstantial or otherwise, that he ever obtained or exerted any control over the coin collection, ammunition, or reloading supplies, he overlooks his statements to Officer Armstrong during the September 11, 2020, interview. There, defendant acknowledged that he knew Rocky Daniels was bringing items to his house and keeping them in the basement, where Daniels was living. Although defendant had been told by Daniels that the items were the product of "dumpster diving," defendant told police he knew better. According to defendant, he confronted Daniels and protested that the items were too valuable to be found in a dumpster. Defendant said it might be normal to find a coin in a dumpster, but not an entire collection. These remarks by defendant certainly establish that he was aware of the coins and that they might well have been stolen.

¶ 57 Even apart from defendant's statements, it is well settled that one means of proving control over a premises is to show that a defendant lived at the premises. *People v. Lawton*, 253 Ill. App. 3d 144, 147 (1993). Also, two or more persons may have actual possession of property because exclusive possession may be joint. *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). Possession may also be constructive. *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 203 (1993). Indeed, evidence that a defendant knew contraband was present and that he exercised control over the premises where the contraband was located establishes constructive possession. *People v. Adams*, 161 Ill. 2d 333, 345 (1994); *People v. Jones*, 295 Ill. App. 3d 444, 453 (1998).

¶ 58 In this case, defendant owned and resided at the residence. He admitted he knew that the coins were on his property and that they were likely stolen. Nothing in the record shows that he did not have access to the basement where Daniels apparently lived. Thus, even though Daniels may have lived in the basement, defendant had control over the entire premises because

- 15 -

he owned it. If two or more people share immediate and exclusive control, then each has possession. *Schmalz*, 194 Ill. 2d at 82; *People v. Trask*, 167 Ill. App. 3d 694, 707 (1988).

¶ 59 Here, we find instructive *Lawton*, a case involving unlawful possession of a controlled substance with intent to deliver. *Lawton*, 253 Ill. App. 3d at 147. There the court concluded that "[d]rugs found on premises controlled by the defendant give rise to an inference that he knowingly possessed the drugs." *Id.* Control, the court stated, can be established by evidence showing the defendant lived there. *Id.* According to *Lawton*, this inference, standing alone, "may support a conviction where there are no other facts or circumstances creating a reasonable doubt of guilt." *Id.* Although the instant case deals with stolen property, not illegal drugs, the concepts of possession are similar, and defendant was aware that the coins in his house were likely stolen. Here, as in *Lawton*, the stolen coins were found on premises controlled by defendant. Moreover, there are no facts in evidence—such as defendant being unable to access Daniels's living area—diminishing the inference of control.

¶ 60 Finally, defendant had the ability to exercise control over the property that Daniels had brought back to the home. Defendant testified that Daniels brought the shotgun to defendant's house and that he was uncomfortable with having a gun in the house because his daughter lived there. Defendant contacted his girlfriend's father, Patrick Roff, who came to defendant's home and retrieved the shotgun at defendant's request. From these facts, a trier of fact could reasonably conclude that defendant had demonstrated the ability to exercise control over any of the items Daniels brought into defendant's home, including the coins and other items found in defendant's house.

¶ 61 Considering the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 62                              2. *Market Value Exceeding $10,000*

¶ 63            Section 16-1(b)(5) of the Criminal Code of 2012 prescribes the sentence for theft of property with a value exceeding $10,000 but not exceeding $100,000 as a Class 2 felony. 720 ILCS 5/16-1(b)(5) (West 2020). Defendant argues that the State failed to satisfy its burden of proving beyond a reasonable doubt that the coin collection's value exceeded $10,000, arguing that the valuation testimony of its owner was insufficient.

¶ 64            The value of stolen property is the fair cash market value at the time and place of the theft, not the cost of the property. *People v. Perry*, 224 Ill. 2d 312, 336 (2007). In establishing this value, the unrebutted testimony of a witness experienced with the stolen property may suffice as to its value. *People v. Dell*, 77 Ill. App. 2d 318, 325 (1966) (holding that testimony from an individual who purchased trousers for his business for a period of seven years was sufficient to establish the value of the stolen trousers); *People v. Parker*, 98 Ill. App. 2d 146, 150 (1968) (holding that testimony of an automotive sales manager was sufficient to establish adequate proof of a stolen automobile's fair market value).

¶ 65            Carstens, the owner of the coin collection, testified that he had been collecting coins since he retired in 2001 and that he had spent considerable time and money building his collection. The trier of fact could conclude that Carstens had considerable expertise in coin collecting and was knowledgeable of the value of his own collection. Carstens estimated the cost of his collection to be approximately $50,000, and he offered specific examples of the value of certain parts of his collection: the three gold coins, valued at $9000, and the Indian Head penny collection, valued at approximately $15,000. Carstens's testimony stands unrebutted and satisfies section 16-1(b)(5)'s $10,000 threshold.

¶ 66 We conclude that the record easily supports a finding that the coin collection's value exceeded the $10,000 threshold.

¶ 67 C. Restitution

¶ 68 The trial court further ordered restitution in the amount of $33,000, pursuant to section 5-5-6 of the Unified Code of Corrections (730 ILCS 5/5-5-6 (West 2020)). Defendant challenges the sufficiency of the evidence supporting the award of restitution, further contending that defendant's conduct "did not proximately cause the financial injuries" to the victim.

¶ 69 We begin by addressing the State's contention that defendant has forfeited this issue by failing to address it in his posttrial motion. It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010) (citing *People v. Bannister*, 232 Ill. 2d 52, 76 (2008)); see 730 ILCS 5/5-4.5-50(d) (West 2020) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk within 30 days following the imposition of sentence."). Here, defendant's motion to reconsider his sentence argued only that the sentence was excessive; that it violated article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, § 11); and that it failed to consider various factors in mitigation in accordance with section 5-5-3.1 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1 (West 2020)). It did not challenge the award of restitution.

¶ 70 Consequently, we may only review this claimed error if defendant established plain error, which he now argues on appeal. *Hillier*, 237 Ill. 2d at 545; Ill. S. Ct. R. 615(a) (eff., Jan. 1, 1967). The plain-error doctrine is a narrow and limited exception. *Bannister*, 232 Ill. 2d at 65. To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred.

*People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545 (citing *People v. Hall*, 195 Ill. 2d 1, 18 (2000)). Under the second prong of plain-error review, " '[p]rejudice to the defendant is presumed because of the importance of the right involved.' " *Piatkowski*, 225 Ill. 2d at 564-65. A defendant has the burden of persuasion under both prongs of the plain-error doctrine (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008); *People v. Herron*, 215 Ill. 2d 167, 187 (2005)), and if that burden is not met, the procedural default will be honored (*Naylor*, 229 Ill. 2d at 593).

¶ 71        In addressing defendant's plain-error contention, it is appropriate to first determine whether error occurred at all. *Hillier*, 237 Ill. 2d at 545. Section 5-5-6 provides that "the [trial] court shall order restitution" in all convictions for offenses in violation of the criminal code "in which the person received any injury to his or her person or damage to his or her real or personal property as a result of the criminal act of the defendant." 730 ILCS 5/5-5-6 (West 2020). According to section 5-5-6, when restitution is ordered, the court shall determine the restitution owed at the sentence hearing. In doing so, the court

> "shall determine whether the property may be restored in kind to the possession of the owner or the person entitled to possession thereof; or whether the defendant is possessed of sufficient skill to repair and restore property damaged; or whether the defendant should be required to make restitution in cash, for out-of-pocket expenses, damages, losses, or injuries found to have been proximately caused by the conduct of the defendant or another for whom the defendant is legally accountable." *Id.* § 5-5-6(a).

Moreover, in fixing the amount of restitution to be paid in cash, the court shall:

"allow credit for property returned in kind, for property damages ordered to be repaired by the defendant, and for property ordered to be restored by the defendant; and after granting the credit, the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge." *Id.* § 5-5-6(b).

¶ 72 According to the statute's plain language, "the trial court must evaluate the actual costs incurred by the victim and cannot rely on conjecture or speculation as to the amount to be awarded." *People v. Birge*, 2021 IL 125644, ¶ 48 (citing *People v. Dickey*, 2011 IL App (3d) 100397, ¶ 25). Thus, under *Birge*, "[t]o satisfy the requirement, then, the trial court must receive sufficient information to evaluate the accuracy of the victim's restitution claim." *Id.*

¶ 73 Here, defendant argues against restitution, asserting that (1) the State failed to establish proximate cause or that defendant committed the crime and (2) if restitution was appropriate, the amount was wrongly valued due to evidentiary deficiencies. Since we have already upheld defendant's conviction for theft, we need only address his second assertion that the State failed to establish the restitution amount.

¶ 74 As defendant points out, the estimated value of the various coin items did not match the total sum ordered paid in restitution and cannot be reconstructed from the testimony. At most, the State proved a value of $24,000: the gold coins were valued at $9000 and the Indian Head penny collection was valued at $15,000. Additionally, while we know that some of the items were returned, the State did not sufficiently establish which ones; it also failed to establish the value of any of the returned items. Carstens testified that his *entire* coin collection cost approximately

$50,000 and offered testimony concerning the current fair market value of certain items taken. But there is no itemization comparing this value against what was taken, returned, and/or still missing.

¶ 75    The record gives rise to a concern that defendant was ordered to make restitution to Carstens for the value of items that may have been returned. In general, a trial court's determination on restitution, like other sentencing issues, will not be reversed on appeal absent an abuse of discretion. *In re M.Z.*, 296 Ill. App. 3d 669, 673 (1998); *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 35. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. We conclude that the amount of ordered restitution is arbitrary and unreasonable and is not supported by the evidence. It would be fundamentally unfair if defendant were ordered to compensate the victim for property that was ultimately returned.

¶ 76    Having found that error occurred, we now move on to the rest of the plain-error analysis. We note that in *People v. Lewis*, 234 Ill. 2d 32, 47-49 (2009), the court held that an unpreserved challenge to the assessment of a street-value fine was a plain error that affected the integrity of the judicial process and the fairness of the proceeding. More recently, in *Birge*, 2021 IL 125644, ¶ 53, the court, relying on *Lewis*, held that the second prong of the plain-error analysis permitted review of an unpreserved issue relating to restitution where there was no numerical evidence presented of the victim's loss. There, the victim testified about the various damages to the properties, "[b]ut his testimony merely described the general damage that occurred. It did not ultimately assist in calculating the cost of his actual losses." (Emphasis omitted.) *Id.* ¶ 49. Because the restitution amount awarded had no actual basis in the trial or sentencing evidence, the court found that the restitution order was clear error. *Id.* Accordingly, the court vacated the restitution

order and remanded for a new hearing and determination as to the appropriate amount of restitution owed.

¶ 77        We find *Lewis* and *Birge* persuasive and, in reliance thereon, conclude that the trial court's error denied defendant a fair sentencing hearing concerning the award of restitution. According to the restitution statute's plain language, a trial court must evaluate the actual costs incurred by the victim and cannot rely on conjecture or speculation as to the amount to be awarded. See *Dickey*, 2011 IL App (3d) 100397, ¶ 25. To satisfy the requirement, then, the trial court must receive sufficient information to evaluate the accuracy of the victim's restitution claim. Although we affirm the trial court's determination to order defendant to make restitution to the victim, we remand this case to the trial court for further consideration of the proper amount. In doing so, the trial court must account for the fair market value of the items taken but not returned; the value of items returned to the victim should not be included in the order of restitution.

¶ 78                                III. CONCLUSION

¶ 79        For the reasons stated, we affirm in part, reverse in part, and remand for a determination and explanation of the amount of restitution owed by defendant.

¶ 80        Affirmed in part and reversed in part; cause remanded.

*People v. Synowiecki*, 2023 IL App (4th) 220834

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Livingston County, No. 20-CF-228; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Anne R. Brenner, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Michael P. Regnier, State's Attorney, of Pontiac (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |