NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230851-U

NO. 4-23-0851

IN THE APPELLATE COURT

OF ILLINOIS

THE FOURTH DISTRICT

FILED
December 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Tazewell County |
| MATTHEW R. NULL, | ) | No. 21CF216 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed in part and remanded with directions, finding
(1) defense counsel did not render ineffective assistance by not moving to dismiss
the aggravated arson and obstructing justice charges on compulsory joinder
grounds, (2) defendant's convictions for obstructing justice and theft did not
violate the one-act, one-crime rule, (3) counsel's failure to make certain
evidentiary objections was not ineffective assistance, (4) the trial court did not err
in considering defendant's drug addiction an aggravating factor at sentencing,
(5) the court did not err in admitting defendant's post-*Miranda* (see *Miranda v.
Arizona*, 384 U.S. 436 (1966)) statements as evidence at sentencing, and (6) the
court erred by failing to specify the restitution payment manner and timeline.

¶ 2    In December 2021, the State indicted defendant, Matthew R. Null, with two

counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)), aggravated arson (720

ILCS 5/20-1.1(a) (West 2020)), aggravated possession of a stolen firearm (APSF) (720 ILCS

5/24-3.9(a)(1) (West 2020)), theft (720 ILCS 5/16-1(a)(1)(B) (West 2020)), unlawful use of

account numbers (UUAN) (720 ILCS 5/17-38(a) (West 2020)), and obstructing justice (720

ILCS 5/31-4(a) (West 2020)). After a trial, the jury found defendant guilty on all counts. The

trial court sentenced defendant to an aggregate 90 years' imprisonment and ordered him to pay $309,125.95 in restitution.

¶ 3　　　　　Defendant appeals, arguing (1) defense counsel was ineffective for not moving to dismiss the aggravated arson and obstructing justice charges on compulsory joinder and speedy trial grounds, (2) his convictions for obstructing justice and theft violated the one-act, one-crime rule, (3) counsel was ineffective for not making several evidentiary objections, (4) the trial court erred by finding defendant's drug addiction was an aggravating factor during sentencing, (5) the court erred by admitting defendant's post-*Miranda*-invocation statements (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) at sentencing, and (6) the court committed second-prong plain error by failing to set the restitution payment manner and timeline. We affirm in part and remand with directions.

¶ 4　　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　　　　　　　　　　A. The Charges

¶ 6　　　　　On April 13, 2021, the State charged defendant with one count of murder. According to the probable cause affidavit, on April 10, 2021, law enforcement responded to 203 Gunion Avenue in Pekin, Illinois, based on reports of a residential fire and a dead body inside the home. The autopsy's preliminary finding indicated the victim, Kailey Windish, had been strangled and was dead when the fire started. Initial findings from the fire investigators suggested the fire was not an accident. Law enforcement learned defendant called Kailey several times in the early morning hours of April 10, 2021, and his phone was at the residence from approximately 5:44 a.m. until approximately 12:09 p.m. The homeowners, Kailey's parents, reported several items were missing, including a credit card used to make an online purchase on April 11, 2021. The online order had been placed using defendant's phone, and the purchased

item was scheduled to be sent to an address in Pekin connected to defendant.

¶ 7        On April 29, 2021, a grand jury returned a bill of indictment, charging defendant with two counts of murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)), APSF (720 ILCS 5/24-3.9(a)(1) (West 2020)), theft (720 ILCS 5/16-1(a)(1)(B) (West 2020)), and UUAN (720 ILCS 5/17-38(a) (West 2020)). On December 16, 2021, the grand jury issued a superseding bill of indictment, which retained the initial five counts and added charges for aggravated arson (720 ILCS 5/20-1.1(a) (West 2020)) and obstructing justice (720 ILCS 5/31-4(a) (West 2020)).

¶ 8        Before trial, defendant moved to suppress a portion of his statement to police. Towards the end of the nearly hour-long interview, defendant invoked his right to silence and requested an attorney. Defendant said, "I'm going to have to plead the Fifth [(U.S. Const., amend. V)]. I'm pretty sure I figured out what's going on." The detective asked, "What do you think is going on?" Defendant responded, "At this point, I'm gonna, I need a lawyer present probably, so. I figured it out. I think I hurt her, so I'm gonna ask for a lawyer." Police then stopped asking questions. The trial court granted defendant's motion to suppress and prohibited the State, during its case-in-chief, from using defendant's statements made after invoking the fifth amendment.

¶ 9                            B. The Trial

¶ 10        In May 2023, the trial court conducted defendant's jury trial. The evidence showed the following.

¶ 11                            1. *The Murder*

¶ 12        On Friday, April 9, 2021, Kailey Windish attended an orientation for her new job and then returned to her parents' home in Pekin, where she lived. Her parents were visiting her sister in Texas. Kailey had contacted defendant a few days earlier about getting together that

night. Defendant said he wanted to go to her house, though her parents did not want anybody at the house while they were gone. Kailey's neighbor, Larry Smith, whom Kailey's parents asked to "keep an eye on the place," testified he noticed "a little white car, four-door white car" in the Windish's driveway around 7 p.m. Smith had never seen that white car in the driveway before.

¶ 13    Data from Kailey's and defendant's cell phones confirmed they were together at 8:09 p.m. on April 9, 2021. They were at Dairy Queen between 8:30 p.m. and 8:40 p.m., then they went to a gas station, and then returned to Kailey's home, where they remained until approximately 10:30 p.m., when defendant left to get drugs. Kailey stayed in the home. Defendant ultimately did not come back to Kailey's house that night, though he and Kailey continued to send text messages to each other. Defendant's cell phone data placed him near his parents' residence in Manito, Illinois, from approximately 11 p.m. until 4 a.m. Defendant called Kailey at 5:17 a.m. on Saturday, April 10, 2021, and he arrived at Kailey's home at 5:45 a.m. and stayed until 11:55 a.m.

¶ 14    Larry Smith testified he saw the white car at the Windish residence when he woke up at 7 a.m. on Saturday. At around 10 a.m., Smith heard something that "sounded like somebody was trying scream but, you know, I just couldn't really tell." He explained, "It was very quick and kind of muffled, you know." Smith testified he "[j]ust really didn't do anything because I really didn't know for sure what I heard." The white car was no longer parked in the Windish driveway when he left for lunch at noon. When he returned home around 2 p.m., he saw smoke coming from the Windish home and Kailey's boyfriend, Kyle Krofchik, pulling into the driveway. He yelled for Kyle to call 911. Kyle briefly entered the home and ran back out, saying "something to the effect she's dead and she's burned up or she's burned up and dead."

¶ 15    Kyle Krofchik testified he texted Kailey throughout the day on Friday, April 9,

and she last texted him at 11:50 p.m. Kailey did not respond to Kyle's 9 a.m. text on Saturday morning, and he presumed she was still sleeping. He texted her again at 1 p.m., and he became concerned when he noticed the text was "not delivered." He decided to drive to Kailey's house to check on her. His cell phone data confirmed he arrived at the Windish home shortly before 2 p.m. He tried calling Kailey, but the call went straight to voicemail. As Kyle approached the house, he noticed the next-door neighbor, Smith, in his front yard yelling and pointing toward Kailey's window because "there was, like, a ton of smoke coming out of her window." Kyle ran into the house through the unlocked front door. He described the house as "super smoky." He made his way to Kailey's bedroom and saw "[t]here was fire throughout her—on her bed. And I'm pretty sure on her there was fire." He said he was "screaming her name" and "tried to shake her," but he "knew she was gone." He recalled Kailey's body "felt, like, burnt." Kyle ran out of the house and "went to the neighbor" and said "she's—she's burnt to a crisp in there, man. Like, what happened?"

¶ 16         The State played Kyle's 911 call for the jury, wherein he said his "girlfriend was on fire in her bedroom." He kept repeating some variation of the statement that Kailey was dead and her body was burned. Kyle relayed Smith's observation that, "there was a white car here earlier, I guess." He stated, "her neighbor said a car was here earlier and left." At trial, Kyle recalled a man previously worked on Kailey's computer and would not give it back. Kailey had "mentioned he had a white car." Kyle said the man lived in Manito.

¶ 17         The Pekin Fire Department and law enforcement responded to the Windish residence a few minutes after Kyle's 911 call. Joseph Gropp, a Pekin firefighter, entered the home and crawled to Kailey's bedroom. He observed a fire on the bed and extinguished it. He saw a human body with "no signs of life" on the bed. Gropp, who was also a fire investigator,

- 5 -

testified his training and experience led him to believe this was a "suspicious" fire that would need to be investigated, as there was a smoke detector on the floor outside the bedroom and the battery had been removed.

¶ 18    The trial court accepted Illinois State Fire Marshal Bobby Joe Brown as an expert in fire investigation. Brown testified he investigated the fire at the Windish home. The damage indicated the fire originated in Kailey's room, based on "the ventilation pattern where it come [*sic*] out the open doorway." Brown observed "the heaviest concentration of heat and fire damage was *** on the bed itself." Brown opined the fire was not particularly hot, and Kailey's injuries suggested a slow-burning fire. In Brown's expert opinion, the fire was set intentionally when someone "ignited either the human herself, they ignited the cloth that was wrapped around her head, or they ignited bedding that was in the bedroom."

¶ 19                    2. *The Autopsy*

¶ 20    Dr. Amanda Youmans testified she performed an autopsy on April 11, 2021. Youmans observed "the body was heavily charred and burned." According to Youmans, "The arms were severely damaged by the fire to the point where the soft tissue had burned down to the bones and muscles and her fingertips were absent *** due to thermal injury." She noted "there was a cloth, perhaps a towel, over the face," but the "head and face, neck were heavily charred" and the person "was unrecognizable." Youmans determined the body was female, "probably of Caucasian race." The body Youmans examined was identified as Kailey Windish by a forensic odontologist using dental records.

¶ 21    Youmans found no soot in the lungs, indicating Kailey "was likely deceased prior to the fire." Based on her examination of Kailey's internal organs, Youmans concluded she had been healthy and there was "no other natural disease process that could explain why she was

- 6 -

deceased prior to the fire." Youmans observed dark areas in the neck muscles leading to Kailey's hyoid bone, which Youmans determined were hemorrhages caused by pressure to the throat. She testified the right side of the hyoid bone was broken. Based on the injuries she observed, Youmans determined there was "a lot of pressure, sustained pressure on the throat or in the neck area," which "is also what [broke] the hyoid bone." She testified these injuries were "very characteristic of strangulation." Youmans concluded Kailey died from strangulation, which occurred prior to the fire.

¶ 22                                        3. *Kailey's Parents*

¶ 23          Kim Windish, Kailey's mother, testified Kailey was 31 years old and had been diagnosed with hyperlexia, a form of autism, at age 4. Kim explained, "When a person is hyperlexic, they don't do well socially and they don't do well with spoken English language or any language." Kailey "had problems picking up verbal cues," and she communicated better through writing. Kim recalled times when people would speak to Kailey, and Kailey would just stare at them because she did not understand what they were saying. When Kailey became distressed, she would sometimes rock when sitting in a chair or would flap or wring her hands. Kailey had difficulty getting jobs because of her problems with verbal communication. Kailey primarily communicated and interacted with people on her computer. Kim estimated Kailey's social maturity age would be "between 15, maybe 17."

¶ 24          Kim and her husband, John, would leave Kailey alone when they visited their elder daughter in Texas. Kim would prepare food ahead of time for Kailey to eat while they were gone, and she would inform her mother and her neighbor, Smith, when they would be out of town. Smith "would just keep an eye on things and make sure he knew who was coming and going" from the house. Kim and John left on Thursday, April 8, 2021, and planned to be gone

through Tuesday, April 13, 2021. Before leaving, Kim instructed Kailey to keep the windows and doors locked and to have no one in the house except for Kyle, whom the family trusted. Kim did not allow other people in the house while she and her husband were away out of concern for Kailey's communications with people online.

¶ 25    Kim and John returned to Pekin on Saturday, April 10, 2021, after learning about the fire. They accompanied the police to their home and observed their bedroom was not in the condition in which they left it. Several of John's gun cases lay empty on the bed. Drawers from Kim's jewelry box and the case holding her presidential coin collection were also empty on the bed. A makeup case and a wallet had been removed from the closet and were on the floor, and the purse that matched the wallet was missing. The credit cards Kim kept on her dresser were missing, along with some of her rings, an acoustic guitar belonging to John, and her and John's rosaries. Kim estimated the value of her rings exceeded $500 because the individual rings' prices ranged from $5 to $700.

¶ 26    On Sunday, April 11, 2021, John received a fraud notice from his credit card company. The company told John what was purchased, when it was purchased, and from where it was purchased, and he relayed this information to the police.

¶ 27    John went to the police department to identify items the police recovered during the investigation. John identified three firearms—a .380 Llama handgun, a Taurus G2c 9-millimeter semi-automatic handgun, and a Smith & Wesson 9-millimeter semi-automatic handgun. He identified his missing credit card, Kim's coin collection, four of his watches, rings belonging to Kim and Kailey, his guitar, and his family's rosaries. John testified the value of the items he identified easily exceeded $500, stating the "guns were worth over $1,000 just by themselves."

¶ 28                         4. *Linking Defendant to Kailey*

¶ 29          Detective Brian Willmert testified as an expert in digital and cellular forensics. Willmert investigated the fraudulent charges made with John's credit card on April 11, 2021, and discovered the shipping address, phone number, and e-mail address used belonged to defendant. Willmert obtained a warrant to seize the package, and he intercepted the package from a FedEx facility. Willmert noted the address on the package was 402 Camden Street in Pekin, which was defendant's last known address.

¶ 30          Willmert testified he obtained Kailey's, defendant's, and Kyle's phone records, call detail records, historical information of their data usage, and historical text message information for data. Willmert testified to how their cell phones moved from April 8, 2021, to April 11, 2021.He corroborated their whereabouts during the events in question by viewing surveillance footage when available. Notably, the cell phone data indicated defendant was at the Windish home from 5:45 a.m. until 12:09 p.m. on Saturday, April 10, 2023. Kyle arrived at the house at 1:57 p.m. that day and called 911 soon after.

¶ 31          Detective Justin Fitzgerald of the Pekin Police Department testified he investigated Kailey's death and the fire in the Windish home. Fitzgerald analyzed data from defendant's cell phone and found pictures of property taken from the Windish home, as well as e-mails sent to defendant's e-mail address confirming an online purchase using John's stolen credit card. Fitzgerald went to defendant's parents' residence in Manito on April 13, 2021, where he saw a white Nissan Sentra in the driveway. He could see two handguns in the car.

¶ 32          Erin Bowers, a crime scene investigator with the Illinois State Police, testified she processed a seized white 2018 Nissan Sentra on April 13, 2021. In the rear passenger seat, she found a black and yellow quilted bag, which contained a loaded Llama handgun, a loaded black

Taurus handgun, watches, credit cards, commemorative coins, and a ring. She also found an acoustic guitar in the trunk.

¶ 33　　　　　Charles Null, defendant's father, testified defendant, whose nickname was Bub, did not live with him. However, defendant would park in Charles's driveway and sleep in his car. Before he was arrested, defendant showed Charles two different handguns, saying he got them from a friend. Defendant asked Charles to buy the guns, but Charles refused.

¶ 34　　　　　Elizabeth Shroyer testified she met defendant on Facebook in August 2019. Defendant used the name Bub in his Facebook profile. Shroyer had been engaged to defendant before their breakup in late 2020. Shroyer testified defendant called her several times on Sunday, April 11, 2021. Defendant sent her pictures of various rings, earrings, watches, a black and yellow quilted purse, a rosary, and a brown acoustic guitar and asked her how much the items were worth. Defendant claimed he inherited them when his aunt passed away. Defendant asked Shroyer to go to a pawn shop with him the following Saturday.

¶ 35　　　　　Nick Taylor, a patrol sergeant with the Pekin Police Department, testified he interviewed defendant on April 13, 2021, at the police station. The interview was audio and video recorded, and the State played the interview for the jury. During the interview, defendant stated he drove a 2018 white Nissan Sentra. Defendant admitted to using methamphetamine heavily for roughly two and a half years. Defendant would smoke meth and forget "huge gaps of time." Defendant told Taylor he would use meth, be awake for two days, and "then my other guy comes out." When asked about his "other guy," defendant explained a friend told him he became another person after a meth binge. Defendant was told he became "weird," "real pissy and short," and "real violent." Defendant recalled Kailey asked him to fix her laptop. He initially forgot to return the laptop, and it sat in his car for weeks, but he eventually returned it.

¶ 36        Defendant told Taylor it had been weeks since he last spoke to Kailey, and that he blocked her on Facebook because she "freaked out" on him. When Taylor said he knew defendant met up with Kailey recently, defendant responded, "I did?" Defendant said he remembered waking up in his car on Monday, April 12, 2021. Defendant said when he woke up, he did not know dates and times—he only saw "flashes, like a picture book." Eventually, defendant remembered seeing Kailey on Friday, April 9, 2021. She got him gas and they went to Dairy Queen. Defendant remembered being in a house, which he described as an "old-person house," with a floral couch and a "brown and white dog." He remembered having sex with Kailey in a bedroom before being "called away" by friends to get drugs. He said he did not remember anything else until Monday, when he awoke in his car and found a guitar and a bag containing jewelry, coins, credit cards, and handguns. Defendant insisted he did not remember how he got the items. Defendant admitted he used one of the credit cards to order a pair of boots online.

¶ 37        The State rested its case-in-chief. Defendant did not present any evidence. After closing arguments, the jury found defendant guilty on all counts.

¶ 38                                C. Sentencing

¶ 39        During sentencing, the State presented the short portion of defendant's interview that was suppressed before trial. The trial court admitted it over defendant's objection, finding it to be accurate, reliable, and relevant for sentencing. The court explained it had to weigh "getting the best possible information to fashion the most appropriate sentence versus any deterrence effect for the police and looking at that balancing factor test."

¶ 40        Seth Ranney of the Pekin Police Department testified he was present for defendant's interview with Taylor. Ranney laid the foundation for the video, and the court

admitted it over defendant's prior objection. The video showed the last few minutes of the interview, during which defendant invoked the fifth amendment because he "figured out what's going on." When Taylor asked what was going on, defendant responded, "I need a lawyer present probably. I think I hurt her. I'm going to ask for a lawyer." Taylor and Ranney then left the interview room. After sitting quietly for a few moments, defendant began talking to himself, saying, "Oh no, Oh Bub, you idiot," and, "Oh my god, I don't think I did. There's no way I came back." Defendant then asked, "Or did he come back?" He then looked to the side and said to no one, "You got me in trouble for the last time."

¶ 41       In imposing sentence, the trial court described the evidence of defendant's guilt as "overwhelming." The court asserted it considered the presentence investigation report, the evidence presented at trial, defendant's statement in allocution, the letters in support of defendant, the victim impact statements, and "all statutory and nonstatutory factors in aggravation and mitigation." In mitigation, the court noted defendant's lack of criminal history. The court found defendant's meth addiction "could be a double-edged sword or it could be both, but in this case, I find your addiction considering the totality of the evidence to be an aggravating factor in my analysis." Based on "[t]he nature of the depravity" of the offense, the court found defendant lacked rehabilitative potential, and it told defendant, "Society must be protected from you. Deterrence is an important aggravating factor in this case. The need for punishment, the seriousness of the offense, and I did take into consideration your history and character." The court imposed an aggregate sentence of 90 years' imprisonment. The murder charges merged, and the court sentenced defendant to 60 years for first degree murder, 30 years for aggravated arson, 8 years for APSF, 5 years for theft, 4 years for UUAN, and 2 years for obstructing justice. The 60-year and 30-year sentences would run consecutively, while the remaining sentences

would run concurrently with the 30-year sentence.

¶ 42    Before the hearing ended, the State reminded the trial court about fines, costs, and restitution. This exchange followed:

"THE COURT: I forgot about that, and Mr. Johnson did it.

I will order the $1,000 in restitution and it's $300,191 or

$300,125.91.

MR. JOHNSON [(STATE'S ATTORNEY)]: "Yeah.

308,125.95.

THE COURT: The Court will order that, and —

MS. MULLIKIN [(ASSISTANT STATE'S

ATTORNEY)]: Fines, would you just like them [*sic*] mandatory

minimum?

THE COURT: Minimum. Minimum fines and costs."

¶ 43    Defendant filed a motion to reconsider, arguing that his sentence was excessive because the trial court did not properly weigh the mitigating evidence, which the court denied.

¶ 44    This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46    Defendant appeals, arguing (1) his convictions for aggravated arson and obstructing justice must be reversed because defense counsel rendered ineffective assistance by failing to move to dismiss those charges on compulsory joinder and speedy-trial grounds, (2) his convictions for obstruction of justice and theft should be vacated or reduced because they violate the one-act, one-crime rule, (3) counsel provided ineffective assistance by failing to make various evidentiary objections, (4) the trial court erred by failing to consider defendant's drug

addiction as a factor in mitigation during sentencing, (5) the court erred by admitting, at sentencing, defendant's statements made after invoking his right to counsel, and (6) the court committed second-prong plain error by failing to set the manner and method for defendant to pay restitution and not considering his ability to pay.

¶ 47                                      A. Compulsory Joinder

¶ 48         Defendant argues counsel rendered ineffective assistance by not moving to dismiss the aggravated arson and obstructing justice counts added in the superseding indictment. Specifically, he contends the State was required to bring those charges in the initial indictment, and, because 120 days passed between the initial and superseding indictment, his speedy trial right was violated.

¶ 49         The Illinois and United States Constitutions guarantee criminal defendants the right to counsel, and the latter mandates, "the right to counsel is the right to the effective assistance of counsel." (Internal quotation marks omitted.) *Strickland v. Washington*, 466 U.S. 668, 686 (1984); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When presented with a defendant's ineffective assistance of counsel claim, we apply the well-established, two-part *Strickland* test. *People v. Cherry*, 2016 IL 118728, ¶ 24, 63 N.E.3d 871. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms, and (2) counsel's deficient performance prejudiced the defendant, *i.e.*, but for counsel's errors the result of the proceeding would have been different. See *People v. Young*, 341 Ill. App. 3d 379, 383, 792 N.E.2d 468, 472 (2003); *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26, 79 N.E.3d 232.

¶ 50         To sufficiently prove deficient performance, the "[d]efendant must overcome the

strong presumption that the challenged action or inaction may have been a result of sound trial strategy." *Peck*, 2017 IL App (4th) 160410, ¶ 29. Examples of counsel's strategic trial decisions can include what witnesses to call to testify (*People v. Pope*, 2020 IL App (4th) 180773, ¶ 66, 157 N.E.3d 1055), what motions to file (*Peck*, 2017 IL App (4th) 160410, ¶ 29), or what objections to make and when to make them (*People v. Pecoraro*, 175 Ill. 2d 294, 327, 677 N.E.2d 875, 891 (1997)). We ordinarily defer to counsel's decisions in those situations, rather than consider them with the benefit of hindsight. See *Peck*, 2017 IL App (4th) 160410, ¶ 29 (holding matters of trial strategy are "entitled to great deference"). To be sure, constitutionally effective representation from counsel does not translate to "perfect[ ] representation, and mistakes in strategy or in judgment do not" alone amount to deficient performance. *People v. Fuller*, 205 Ill. 2d 308, 331, 793 N.E.2d 526, 542 (2002). If a defendant fails to prove deficient performance, the court need not consider the prejudice prong, and vice versa. *People v. Torres*, 228 Ill. 2d 382, 395, 888 N.E.2d 91, 100 (2008); *People v. Graham*, 206 Ill. 2d 465, 476, 795 N.E.2d 231, 238 (2003).

¶ 51        Section 3-3(a) of the Criminal Code of 2012 provides that "[w]hen the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense." 720 ILCS 5/3-3(a) (West 2020). The compulsory joinder rule requires the State to bring multiple charges in a single prosecution in certain situations. *People v. Keys*, 2023 IL App (4th) 210630, ¶ 88, 227 N.E.3d 136. "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution *** if they are based on the same act." 720 ILCS 5/3-3(b) (West 2020). The compulsory joinder "statute was enacted to prevent the prosecution of multiple offenses in a piecemeal fashion and

to forestall, in effect, abuse of the prosecutorial process." *People v. Quigley*, 183 Ill. 2d 1, 7, 697 N.E.2d 735, 738 (1998).

¶ 52　　　　Per the statute, the compulsory joinder "rule is subject to three conditions: (1) the several charges are known to the prosecution when the prosecution begins, (2) the charges are within the jurisdiction of a single court, and (3) the charges are based on the same act." *Keys*, 2023 IL App (4th) 210630, ¶ 88. This case turns on the third condition—whether the aggravated arson and obstructing justice charges were based on the same act as the initial murder charge. According to our supreme court, "[j]oinder is required where the defendant is engaged in only one continuous and uninterrupted act." (Internal quotation marks omitted.) *People v. Hunter*, 2013 IL 114100, ¶ 18, 986 N.E.2d 1185. Conversely, "independent, overt acts that constitute different offenses are not required to be joined because they are not offenses based on the same act." (Internal quotation marks omitted.) *People v. Gooden*, 189 Ill. 2d 209, 219-20, 725 N.E.2d 1248, 1254 (2000). Therefore, "the same act" means *one* continuous, uninterrupted action, not multiple acts. See *Hunter*, 2013 IL 114100, ¶ 23 ("Indisputably, the legislature did not intend to impose joinder on offenses that arise from a *series of acts* which are closely related with respect to the offender's single purpose or plan." (Emphasis added and internal quotation marks omitted.)). A "series of acts" connotes multiple, distinct acts, even if they are part of a person's overarching criminal scheme. A series of acts does not implicate compulsory joinder. See *Quigley*, 183 Ill. 2d at 8 ("[J]oinder is not required where multiple offenses arise from a series of closely related acts.").

¶ 53　　　　Defendant acknowledges the State alleged, in its superseding indictment and at trial, defendant murdered Kailey by strangling her and set her body on fire to cover up the murder. Defendant's brief describes these actions as "a course of conduct rather than a single

discrete act." Yet he maintains the murder, aggravated arson, and obstructing justice charges were based on the same act. Defendant seems to argue the strangulation and fire ignition was one continuous, uninterrupted act, so it was the same act and not a series of acts closely related to a single purpose or plan. We disagree.

¶ 54    The record indicates defendant strangled Kailey to death before starting the fire. Dr. Youmans testified Kailey died by strangulation, as evidenced by the fractured hyoid bone and the hemorrhages in the neck muscles. Dr. Youmans concluded Kailey died before the fire started because there was no soot in Kailey's lungs—had Kailey been alive and breathing when the fire started, her lungs would have shown evidence of soot. According to Dr. Youmans's testimony, Kailey's cause of death was unrelated to the fire.

¶ 55    The record also shows defendant intentionally set the fire. Gropp, who first responded to the fire and extinguished it, described the fire as "suspicious." State Fire Marshal Brown concluded the fire had been set intentionally when someone "ignited either the human herself, they ignited the cloth that was wrapped around her head, or they ignited bedding that was in the bedroom." State Fire Marshal Brown also testified the fire was slow-burning and not particularly hot. He testified the heaviest fire damage was found in Kailey's bedroom, specifically the bed. A reasonable factfinder could infer from this evidence that defendant ignited the fire shortly before leaving the Windish home around noon because the slow-burning fire was not discovered until approximately 2 p.m.

¶ 56    We find instructive our supreme court's opinion in *People v. Mueller*, 109 Ill. 2d 378, 488 N.E.2d 523 (1985), where it considered whether the offenses of murder and concealing a homicidal death arose from the same act. The court determined they did not, finding, "The murder and the concealment here were accomplished by independent overt acts constituting

different offenses. The acts of shooting *** underlay the murder charges; the concealment offense was grounded in [the] defendant's acts secreting the victims' bodies subsequent to the shootings." *Mueller*, 109 Ill. 2d at 385. The court continued:

> "The fact that the shootings and the acts of concealment were related is irrelevant. There is no requirement of joinder where multiple offenses arise from a series of related acts. [Citations.] 'Section 3-3 is not intended to cover the situation in which several offenses *** arise from a series of acts which are closely related with respect to the offender's single purpose or plan.' " *Mueller*, 109 Ill. 2d at 385.

¶ 57    Like the *Mueller* court, we find it irrelevant that the offenses of murder, aggravated arson, and obstructing justice were related. Compulsory joinder was not required because defendant's crimes arose from a series of related acts within his overarching criminal scheme. Defendant's crimes did not arise from one continuous, uninterrupted act. Because compulsory joinder did not apply, we cannot say defense counsel rendered deficient performance by not moving to dismiss the aggravated arson and obstructing justice counts on compulsory joinder grounds. It is not unreasonable, based on prevailing professional norms, to forgo filing a futile motion. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285. Further, decisions on what motions to file are generally considered trial strategy, and we afford counsel's strategic decisions great deference. *Peck*, 2017 IL App (4th) 160410, ¶ 29. Because we find no deficient performance, we need not consider prejudice, and we can conclude defendant did not receive ineffective assistance from counsel. *Torres*, 228 Ill. 2d at 395.

¶ 58                              B. One-Act, One-Crime

¶ 59    Defendant challenges his theft and obstructing justice convictions on one-act, one-crime rule grounds, arguing the obstructing justice conviction must be vacated because it is based on the same act as the aggravated arson conviction. He also argues his theft conviction should be reduced to a misdemeanor because the act of possessing John's guns was the same act underlying the APSF conviction, and without the guns, the State failed to prove the value of the stolen items exceeded $500.

¶ 60    1. *The Applicable Law and the Standard of Review*

¶ 61    Under the one-act, one-crime rule, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11, 104 N.E.3d 1102. "[A]n 'act' [is] any overt or outward manifestation that will support a separate offense." *People v. Crespo*, 203 Ill. 2d 335, 341, 788 N.E.2d 1117, 1120 (2001). The one-act, one-crime rule operates to preclude "multiple convictions for acts against a single victim." (Internal quotation marks omitted.) *People v. Avelar*, 2017 IL App (4th) 150442, ¶ 25, 81 N.E.3d 607. "In Illinois it is well settled that separate victims require separate convictions and sentences." *People v. Shum*, 117 Ill. 2d 317, 363, 512 N.E.2d 1183, 1201 (1987). "Multiple convictions are proper when there are multiple victims." (Internal quotation marks omitted.) *Avelar*, 2017 IL App (4th) 150442, ¶ 25.

¶ 62    To determine whether a one-act, one-crime violation has occurred, "[f]irst, the court should determine whether the defendant's conduct consists of one physical act or several acts." *Avelar*, 2017 IL App (4th) 150442, ¶ 23. Second, if "the defendant has committed multiple acts, the court should then determine whether any of the charged offenses are lesser included offenses of another charged offense." *Avelar*, 2017 IL App (4th) 150442, ¶ 24. "If so, then multiple convictions are improper; if not, then multiple convictions may be entered." (Internal

quotation marks omitted.) *Avelar*, 2017 IL App (4th) 150442, ¶ 24. "Alleged one-act, one-crime violations present legal issues we review *de novo*." *People v. Melvin*, 2023 IL App (4th) 220405, ¶ 24, 229 N.E.3d 292.

¶ 63        Defendant acknowledges he forfeited this issue by failing to raise it during trial or in a posttrial motion. "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error." *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). Defendant can invoke the plain-error doctrine if he makes one of two showings:

> "(1) a clear and obvious error occurred and the evidence is so
> closely balanced that the error alone threatened to tip the scales of
> justice against the defendant, regardless of the seriousness of the
> error, or (2) a clear or obvious error occurred and that error is so
> serious that it affected the fairness of the defendant's trial and
> challenged the integrity of the judicial process, regardless of the
> closeness of the evidence." (Internal quotation marks omitted.)
> *Thompson*, 238 Ill. 2d at 613.

The Illinois Supreme Court "has previously explained that one-act, one-crime violations fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *Coats*, 2018 IL 121926, ¶ 10.

¶ 64                                     2. *This Case*

¶ 65        Defendant contends the evidence the State presented for the aggravated arson and obstructing justice convictions contemplated a single act—defendant started the fire. Accordingly, defendant argues, because one act supported both convictions, the obstructing

justice conviction violates the one-act, one-crime rule. We disagree.

¶ 66 Looking at the charging instruments, the State premised the aggravated arson charge on defendant "knowingly damag[ing], partially, a building belonging to John Windish located at 203 Gunion Avenue in Pekin, Tazewell County, Illinois, knowing that Kailey Windish was present therein." By contrast, the State premised the obstructing justice charge on defendant "knowingly with the intent to obstruct the prosecution of himself for the offense of murder, knowingly destroyed, altered, concealed, or disguised physical evidence, in that he set fire to the body of Kailey Windish." While these charges could pertain to the single act of lighting a fire, they allege multiple victims. John was the victim of the aggravated arson, as he owned the dwelling defendant damaged by igniting the fire. The victims of the obstructing justice offense were the prosecution, law enforcement, and, ultimately, the People of the State of Illinois. The State's evidence proved these convictions targeted and harmed separate victims. Because there were multiple victims, multiple convictions were appropriate, and no one-act, one-crime rule violation occurred. See *Avelar*, 2017 IL App (4th) 150442, ¶ 25.

¶ 67 Turning to defendant's theft conviction, we again consider the charging instruments. The State premised the aggravated possession of a stolen firearm on defendant "knowingly possess[ing] three firearms, a Llama Especial .380 pistol, a Taurus 9 mm semi-automatic pistol, and a Smith & Wesson 9 mm pistol with knowledge that they had been stolen and without being entitled to the possession of those firearms." By contrast, on the theft charge, the State claimed defendant "knowingly exerted unauthorized control over property belonging to John Windish, being a guitar, jewelry, a coin collection, and firearms, in an amount exceeding $500.00 but less than $10,000.00, with the intent to deprive John Windish permanently of the use or benefit of said property." Defendant contends both charges and convictions were "predicated

on the single act of [him] controlling the guns without authorization." He insists "[u]nauthorized possession of something, which the APSF statute criminalizes, and exercising control over something, which the theft statute criminalizes when it is unauthorized, are one and the same."

¶ 68    Applying the one-act, one-crime test, we first consider "whether the defendant's conduct consists of one physical act or several acts." *Avelar*, 2017 IL App (4th) 150442, ¶ 23. The charging instruments demonstrate the State alleged defendant committed several acts, namely possessing firearms, but also possessing jewelry, a guitar, and a coin collection. The State presented evidence proving defendant possessed all these items. Police found them in defendant's car. The State also presented evidence of defendant taking pictures of these items and asking Shroyer about their value, asking her to accompany him to a pawn shop, and offering her some of the jewelry. Defendant's father testified defendant asked him to buy two of the firearms. These separate actions demonstrated his intent to permanently deprive John of the property. Defendant's possession of the guitar, jewelry, and coins, his investigation into the property's value, and his offer to give or sell some of the items to Shroyer and his father are "overt or outward manifestation[s] that support *** [the] separate [theft] offense," and therefore are additional acts beyond the mere possession of the firearms. *Crespo*, 203 Ill. 2d at 341. Defendant's possession of the firearms was only part of the conduct forming the basis for the theft conviction, so the theft and APSF convictions "were not carved from precisely the same physical act." *Coats*, 2018 IL 121926, ¶ 17. All told, the State alleged and proved defendant's conduct consisted of several acts when he committed theft and APSF. Because defendant's offenses did not result from "precisely the same physical act," we must next consider whether theft and APSF are lesser-included offenses. *Coats*, 2018 IL 121926, ¶¶ 11-12.

¶ 69    "[W]hen the issue of lesser-included offenses arises in the context of a one-act,

one-crime issue where the defendant was convicted of both offenses, we apply the abstract elements approach." *Coats*, 2018 IL 121926, ¶ 30. Under this test,

> "a comparison is made of the statutory elements of the two offenses. If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *People v. Miller*, 238 Ill. 2d 161, 166, 938 N.E.2d 498, 502 (2010).

According to the Criminal Code of 2012, "A person commits theft when he or she knowingly *** [o]btains or exerts unauthorized control over property of the owner *** and *** [i]ntends to deprive the owner permanently of the use or benefit of the property." 720 ILCS 5/16-1(a)(1)(A) (West 2020). It defines APSF as occurring when a person "[n]ot *** entitled to the possession of not less than 2 and not more than 5 firearms, possesses those firearms at the same time or within a one-year period, knowing the firearms to have been stolen or converted." 720 ILCS 5/24-3.9(a)(1) (West 2020). While theft and APSF share the common element of possession or exerting control over something, they share no other elements. Each offense contains an element not included in the other. See *Miller*, 238 Ill. 2d at 166. Theft requires unauthorized control or possession over any property generally and the intent to permanently deprive the owner of the property. See 720 ILCS 5/16-1(a)(1)(A) (West 2020). APSF requires the possession of two to five firearms, while theft does not. See 720 ILCS 5/16-1(a)(1)(A), 24-3.9(a)(1) (West 2020). Furthermore, APSF does not require a person to intend to permanently deprive the owner of the guns. 720 ILCS 5/24-3.9(a)(1) (West 2020). In committing theft, one does not necessarily commit APSF, and vice versa. See *Miller*, 238 Ill. 2d at 166. Therefore, the two crimes are not

lesser-included offenses. See *People v. Schoeberl*, 2022 IL App (3d) 200466-U, ¶ 14. Consequently, defendant's conviction for theft does not violate the one-act, one-crime rule. *Avelar*, 2017 IL App (4th) 150442, ¶ 24. Where there is no error, there can be no second-prong plain error. See *Coats*, 2018 IL 121926, ¶ 32.

¶ 70    C. Defendant's Other Ineffective Assistance of Counsel Claims

¶ 71    Defendant argues his trial counsel rendered ineffective assistance by "failing to object to the State's use of hearsay evidence to satisfy a key element of the UUAN charge, and for not objecting to other incompetent evidence that cumulatively prejudiced [him]." Besides the hearsay evidence supporting the UUAN conviction, the other "incompetent evidence" defendant identifies and challenges includes: hearsay evidence about the person working on Kailey's computer driving a white car; evidence of Kailey's autism and calling her the "victim," which defendant claims unfairly prejudiced him and outweighed any probative value; and improper hearsay evidence of defendant's propensity to become violent on meth.

¶ 72    1. *The Applicable Law*

¶ 73    As previously established, when presented with a defendant's ineffective assistance claim, we apply the two-part *Strickland* test. *Cherry*, 2016 IL 118728, ¶ 24. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms and (2) counsel's deficient performance prejudiced the defendant, *i.e.*, but for counsel's errors the result of the proceeding would have been different. See *Young*, 341 Ill. App. 3d at 383; *Peck*, 2017 IL App (4th) 160410, ¶ 26.

¶ 74    2. *Business Records Affidavit for UUAN Conviction*

¶ 75    The State charged defendant with UUAN as a Class 3 felony, meaning it had to

prove beyond a reasonable doubt that defendant "with intent to defraud either an issuer *** or any other person, utilizes an account number or code or enters information on a record of charge form with the intent to obtain an item or items of value *** [and] the value exceeds $150 in any 6-month period." 720 ILCS 5/17-38(a) (West 2020). The State alleged defendant used a credit card he took from the Windish home to purchase a pair of boots valued at $159.99. Detective Willmert testified he secured a search warrant for records from the online retailer, and he received the requested records, along with a return of information. The State moved to admit the records and the accompanying business records affidavit, pursuant to the business records exception under Illinois Rules of Evidence 803(6) and 902(11) (eff. Sept. 28, 2018), which the trial court admitted without objection from the defense. See Ill. Rs. Evid. 803(6), 902(11) (eff. Sept. 28, 2018).

¶ 76        The return of information established the boots cost $159.99. Defendant now challenges the return of information as improper hearsay evidence because the business records affidavit did not comport with Rule 902(11), which means it did not qualify as an exception to the hearsay rule under Rule 803(6). Specifically, defendant argues the affidavit does not satisfy Rule 902(11)(C) because it did not contain a statement the record "was made by the regularly conducted activity as a regular practice." Ill. R. Evid. 902(11)(C) (eff. Sept. 28, 2018). We acknowledge the business records affidavit was deficient, and defense counsel should have objected to the return of information as improper hearsay evidence based on the inadequate business records affidavit. However, we find counsel's oversight did not prejudice defendant because the State offered other evidence demonstrating the boots' value.

¶ 77        The State presented e-mails from the online retailer to defendant's e-mail address, which listed the price of the boots as $159.99. Defendant contends these e-mails are also

inadmissible hearsay evidence, but we disagree. These e-mails were likely admissible as receipts under Illinois Rule of Evidence 803(24) (eff. Sept. 28, 2018). Rule 803(24) provides receipts are excluded from the hearsay rule if they are used "as *prima facie* evidence of the fact of payment." Ill. R. Evid. 803(24) (eff. Sept. 28, 2018). The e-mails, as receipts, proved defendant paid $159.99 for the boots, thereby establishing the boots' value. Because we see no reasonable probability of a result in this case other than defendant being convicted of Class 3 felony UUAN, we find no prejudice. See *Young*, 341 Ill. App. 3d at 383.

¶ 78                    3. *Hearsay Evidence About a White Car*

¶ 79        Defendant argues Kyle's testimony about Kailey telling him that the person who worked on her computer drove a white car and lived in Manito amounted to inadmissible hearsay evidence. He also contends Kyle's testimony that Smith told him a white car was at the Windish home likewise constituted inadmissible hearsay evidence. Because Kyle's testimony about the white car was cumulative evidence, we find counsel's decision not to raise a hearsay objection did not amount to ineffective assistance.

¶ 80        The State presented admissible evidence establishing a white car was parked in the Windish driveway on Friday night and Saturday morning. Smith testified he first saw a white car in the driveway at 7 p.m. on Friday, it was still parked there before he went to bed, and he saw it there when he got up at 7 a.m. on Saturday. Defendant admitted to police he owned and drove a white 2018 Nissan Sentra, he lived in Manito, and he worked on Kailey's laptop computer. He explained Kailey asked him to fix it and he did, but he forgot to return it to her for several weeks. Through testimony from Detective Willmert, the State also presented cell phone evidence placing defendant at the Windish home on Friday evening and Saturday morning, which corroborated Smith's testimony. The State also played Kyle's 911 call, during which he

said a white car had been there. This statement was admissible as an excited utterance under Illinois Rule of Evidence 803(2) (eff. Sept. 28, 2018). Finally, Detective Fitzgerald testified he observed a white Nissan Sentra in the driveway of defendant's parents' home in Manito. He obtained a warrant and seized the car, searched it, and found items from the Windish home inside the car.

¶ 81 Given all this evidence, we find Kyle's hearsay testimony was cumulative of other properly admitted evidence. "Even if hearsay testimony is improperly admitted, reversal is not warranted where the same matter has been proved by properly admitted evidence." *People v. Torres*, 18 Ill. App. 3d 921, 929, 310 N.E.2d 780, 786 (1974). We cannot say counsel rendered ineffective assistance by not objecting to Kyle's hearsay testimony. Courts typically defer to counsel's decisions on whether or when to make objections because they amount to trial strategy. See *Pecoraro*, 175 Ill. 2d at 327. Even if counsel had objected, the jury heard copious amounts of evidence establishing defendant worked on Kailey's computer, lived in Manito, and drove a white car. We cannot conclude Kyle's hearsay testimony prejudiced defendant, as there is no reasonable probability the result of the trial would have been different had the testimony been excluded. *Young*, 341 Ill. App. 3d at 383.

¶ 82 4. *References to Kailey's Autism and Calling Her a Victim*

¶ 83 Here, defendant argues counsel rendered ineffective assistance by failing to object to testimony about Kailey's autism and descriptions of Kailey as a victim because these statements were unfairly prejudicial. We address each argument in turn.

¶ 84 Kailey's mother, Kim, testified about Kailey's autism. She described how it was diagnosed and how it affected Kailey's life and her interactions with people. Kyle and Smith testified they knew about Kailey's autism diagnosis. On cross-examination from defense

counsel, Smith testified further about Kailey's autism.

¶ 85        According to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *** or misleading the jury, or *** needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011) Defendant concedes this evidence was relevant, but he argues its relevance was outweighed by unfair prejudice because it was cumulative and aroused the jury's passions against defendant. We note evidence of Kailey's autism was relevant because: it explained why Smith was watching the Windish home; it showed the importance of Kailey's computer, which defendant fixed and kept for a long time; and it explained Kailey's preference to communicate via text or Facebook, which is how she communicated with defendant. This evidence also explained why Kailey was unlikely to allow a stranger into her house, which is something the defense sought to raise.

¶ 86        We find no indication in the record the probative value from this relevant evidence was outweighed by any unfair prejudice. The State briefly mentioned Kailey's autism diagnosis during its opening statement, noting she was diagnosed at age four but was high functioning. The State elicited testimony from Kyle, Smith, and Kim about Kailey's autism, but it did not reference her autism during its initial closing argument. It mentioned her autism once in its rebuttal closing argument to address the defense's arguments calling into question Smith's testimony and his reliability as an observant neighbor. The record shows the State did not repeatedly refer to Kailey's autism to inflame the jury's passions. The testimony it presented established Kailey's autism affected her behaviors but also established she was high functioning. The State made no argument that Kailey was any more vulnerable or any more of a victim because of her autism. An objection based on Rule 403 would have been futile, and "a defense

- 28 -

counsel will not be deemed ineffective for failing to make a futile objection." (Internal quotation marks omitted.) *Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 87　　　　　Defendant next argues that references to Kailey as a victim were objectionable because they unfairly prejudiced him. This argument lacks merit. Defendant cites *People v. Williams*, 17 Cal. 142, 147 (1860), for the proposition that it can be prejudicial to refer to the deceased as a "victim." However, *Williams* is distinguishable. There, the defendant was accused of murder and raised the affirmative defense of self-defense at trial, asserting he met force with reasonable force. Before giving the jury a self-defense instruction, the trial court instructed the jury that race should play no part in the verdict, saying, "Nor did the fact, if you so find, that the defendant was seeking to enforce the collection of taxes against another [Chinese person], or even against his *victim*, give the defendant any right to take his life." (Emphasis added.) *Williams*, 17 Cal. at 143. The jury convicted the defendant of manslaughter, and he appealed. *Williams*, 17 Cal. at 144.

¶ 88　　　　　The reviewing court reversed on other grounds, but it commented on the trial court's use of the word "victim" when instructing the jury, saying, "When the deceased is referred to as 'a victim,' the impression is naturally created that some unlawful power or dominion had been exerted over this person. And it was nearly equivalent, in effect, to an expression characterizing the defendant as a criminal." *Williams*, 17 Cal. at 147. The reviewing court chastised the lower court, reminding it to choose its words carefully because juries pay "great deference *** to the opinions and suggestions of the presiding Judge, especially in a closely balanced case." *Williams*, 17 Cal. at 147.

¶ 89　　　　　Here, relying on *Williams*, defendant argues the repeated references to Kailey as the victim prejudiced him because they implied that she died by unlawful means and

characterized him as a criminal. Defendant claims "the State and its witnesses referred to Kailey as the 'victim' a combined 35 times." He further notes, "There were also 21 slides containing videos and photos showing the location of [his] and Kailey's respective phones that also labeled Kailey's residence as the 'Victim's Residence.' " Defendant maintains "the jury was inundated with references to Kailey as the 'victim.' " Defendant's own argument renders *Williams* inapplicable. The State, the witnesses, and the evidence referred to Kailey as the victim. He cites no example of the trial court using the term in front of the jury. More importantly, unlike in *Williams*, Kailey's status was never in dispute, and it was not presented as a question for the jury to decide. Defendant did not raise self-defense, defense of others, or any other defense whereby he would have been justified in killing Kailey. He never alleged he acted out of fear of Kailey or in response to her aggressive behavior. Guilt or innocence in *Williams* hinged on whether the defendant acted in self-defense, whether the deceased instigated the altercation, and whether defendant met force with reasonable force. There, the trial court could have prejudiced the jury and affected the verdict by calling the deceased a "victim." Not so here. No one questioned Kailey's cause of death as strangulation—thereby rendering her a victim—or that her body was burned by nonaccidental means, so it was clear from the uncontested evidence Kailey had died at the hands of someone else. Defense counsel did not provide deficient performance by not objecting to Kailey being called the "victim." See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (holding counsel is not ineffective for not making futile objections).

¶ 90                     5. *Propensity-for-Violence and Hearsay Evidence*

¶ 91          Defendant told police he became a different person when on meth. He said that, after a meth binge, he would be awake for two days and his "other guy" would come out. Defendant informed Taylor he was told he became "weird," "real pissy and short," and "real

violent" after a meth binge. Defendant argues counsel should have objected to these statements because they amounted to inadmissible propensity evidence under Illinois Rule of Evidence 404(a) (eff. Jan. 1, 2011). Alternatively, he argues the statements were inadmissible hearsay statements under Illinois Rule of Evidence 802 (eff. Jan. 1, 2011). Either way, defendant maintains counsel's failure to object to this evidence amounted to ineffective assistance.

¶ 92 Pursuant to Illinois Rule of Evidence 801(d)(2)(A) (eff. Oct. 15, 2015), defendant's statements were not hearsay because they were admissible as statements of a party opponent. The rule defines a "Statement by Party-Opponent," in part, as one "offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth." Ill. R. Evid. 801(d)(2)(A), (B) (eff. Oct. 15, 2015). Defendant's comments meet both definitions, as they are his own statements made in an individual capacity, and they demonstrate his adoption of his friend's description of his behavior while under the effects of meth. Therefore, these statements are not hearsay, they are admissible, and they are immune from a Rule 404(a) challenge.

¶ 93 "Generally, '[a]ny statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission.' " *People v. Thornton*, 2024 IL App (4th) 220798, ¶ 68 (quoting *People v. Aguilar*, 265 Ill. App. 3d 105, 110, 637 N.E.2d 1221, 1224 (1994)). This means "[e]ssentially '*any and every* statement by an accused person may be used against that person as an admission unless excluded by other evidentiary bars.' " (Emphasis added.) *Thornton*, 2024 IL App (4th) 220798, ¶ 68 (quoting *Aguilar*, 265 Ill. App. 3d at 110). Defendant's statements to police about his "other guy" who is "real violent" do not implicate the privilege against self-incrimination or the exclusionary rule because defendant gave the statements after waiving his *Miranda* rights. Even

if they amount to improper propensity evidence to show he acted in accordance with that propensity, they were still admissible under Rule 801(d)(2)(A), (B). Defense counsel cannot be deemed ineffective for failing to object to admissible evidence. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (holding counsel is not ineffective for not making futile objections).

¶ 94                                      D. Drug Addiction as a Mitigating Factor

¶ 95             Defendant argues the trial court erred by considering his drug addiction as an aggravating factor during sentencing. At sentencing, defense counsel asked the court to consider defendant's addiction as a mitigating factor. Counsel maintained defendant acted in an intoxicated rage, and the offenses would not have been committed but for his addiction. Counsel acknowledged defendant's addiction did not constitute a defense but insisted it should be considered in mitigation. The court described drug addiction as "a double-edged sword," noting it could be either a factor in aggravation or mitigation, depending on the facts of each case. Based on the facts presented, the court found defendant's addiction was an aggravating factor.

¶ 96             A trial court enjoys broad discretion when sentencing a defendant. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102, 126 N.E.3d 703. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning." (Internal quotation marks omitted.) *Sturgeon*, 2019 IL App (4th) 170035, ¶ 103. "Under the [Unified Code of Corrections (Unified Code)], drug addiction is not an explicit factor in mitigation or aggravation." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 (citing 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016)). This means "the trial court is not required to view drug addiction as a mitigating factor." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105. We described a defendant's "history of substance abuse [a]s a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105. Notably, the court employed

our "double-edged sword" language during sentencing. The court's statements demonstrate it understood the law and gave due consideration to defendant's meth addiction when determining the appropriate sentence. The court had broad discretion to consider drug addiction as either an aggravating or mitigating factor. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. It chose the former, and we will not disturb that determination.

¶ 97                          E. Post-*Miranda* Statements Admitted at Sentencing

¶ 98          Defendant claims the trial court erred during the sentencing hearing by admitting into evidence the statements he made after invoking his *Miranda* rights. At sentencing, the State submitted a short video of defendant's interview with Taylor, which showed defendant invoking *Miranda* and subsequently talking to himself, saying things like, "Oh no, Oh Bub, you idiot," "Oh my god, I don't think I did. There's no way I came back," and, "You got me in trouble for the last time." The court admitted the video over defense counsel's objection.

¶ 99          Defendant argues this evidence violated his fifth amendment right against self-incrimination and was inadmissible at sentencing. He is mistaken. "It is well settled that the evidentiary standards used in sentencing are much less rigid than those used in the guilt-innocence phase of trial." *People v. Rose*, 384 Ill. App. 3d 937, 940, 894 N.E.2d 156, 160 (2008). "For evidence to be admissible in a sentencing hearing, it is required only to be reliable and relevant, a determination that is within the trial court's discretion." *Rose*, 384 Ill. App. 3d at 941. Most courts considering the application of the exclusionary rule at sentencing "have *** concluded that the exclusionary rule generally does not apply to sentencing hearings." *Rose*, 384 Ill. App. 3d at 942. When deciding whether the exclusionary rule should apply at sentencing, a court should "weigh[ ] the potential deterrent effect of applying the exclusionary rule at sentencing against the goal of having the sentencing judge consider all available relevant and

reliable information in fashioning the most appropriate sentence." *People v. Maron*, 2019 IL App (2d) 170268, ¶ 65, 146 N.E.3d 722.

¶ 100    Here, the trial court asserted it could consider accurate, reliable, relevant evidence at sentencing and explained that it weighed "getting the best possible information to fashion the most appropriate sentence versus any deterrence effect for the police and looking at that balancing factor test." The court's comments show it understood and correctly applied the relevant law. It knew the exclusionary rule did not bar the video clip at sentencing, even though it barred the evidence from the guilt-innocence phase of trial. See *Rose*, 384 Ill. App. 3d at 942. The court knew it could consider reliable, relevant information. See *Rose*, 384 Ill. App. 3d at 941. Finally, the court properly weighed its need for the evidence in fashioning a sentence versus the deterrent effect to police. See *Maron*, 2019 IL App (2d) 170268, ¶ 65. The court exercised its discretion in admitting the evidence, and we will not disturb that determination.

¶ 101    F. Manner and Method for Paying Restitution

¶ 102    In his final argument, defendant contends the trial court committed second-prong plain error by failing to set the manner and method for defendant to pay restitution and considering his ability to pay. On this point, we agree and remand for a proper restitution hearing.

¶ 103    Section 5-5-6 of the Unified Code governs restitution determinations and orders. 730 ILCS 5/5-5-6 (West 2020). Subsection (f) of the Unified Code mandates:

> "Taking into consideration the ability of the defendant to pay, including any real or personal property or any other assets of the defendant, the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of

time not in excess of 5 years, *** not including periods of

incarceration, within which payment of restitution is to be paid in

full." 730 ILCS 5/5-5-6(f) (West 2020).

"Compliance with this statute is mandatory." (Internal quotation marks omitted.) *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 82, 129 N.E.3d 755. If a trial court fails to specify the manner of payment—installments or lump sum—or fails to specify the time for payment, then "the restitution order is fatally incomplete." (Internal quotation marks omitted.) *Hibbler*, 2019 IL App (4th) 160897, ¶ 82.

¶ 104        The record shows the trial court and parties addressed restitution haphazardly. The court made no mention of restitution when it initially imposed defendant's sentence and concluded the hearing. When the State reminded the court about restitution, the court set an amount but it did not set the manner and method for payment, nor did it consider defendant's ability to pay. The court's sentencing order required restitution to be paid to John Windish in the amount of $1000 and to State Farm in the amount of $308,125.95. It did not provide whether restitution would be paid in a lump sum or installments, and it did not set a timeline for payment. The court also entered a financial sentencing order, which also failed to specify a manner and method for paying restitution.

¶ 105        Defendant acknowledges he forfeited this issue because he did not raise it at the sentencing hearing or in his motion to reconsider his sentence. However, we have found second-prong plain error where a trial court failed to comply with the plain language of section 5-5-6 of the Unified Code (730 ILCS 5/5-5-6 (West 2020)). See *People v. Synowiecki*, 2023 IL App (4th) 220834, ¶ 77, 235 N.E.3d 752. In *Hibbler*, the court "fail[ed] to indicate if the restitution was to be paid in a lump sum or installments," but the defendant did not object. *Hibbler*, 2019 IL App

(4th) 160897, ¶ 81. Though we did not expressly invoke second-prong plain error, we remanded the case "for the limited purpose of compliance with the requirements of the Unified Code regarding restitution." *Hibbler*, 2019 IL App (4th) 160897, ¶ 81. We find this case likewise merits a remand for a restitution hearing in compliance with section 5-5-6 of the Unified Code. See 730 ILCS 5/5-5-6 (West 2020).

¶ 106                                    III. CONCLUSION

¶ 107          For the reasons stated, we remand the case to the trial court for the limited purpose of conducting a hearing to determine when restitution is to be paid and the manner in which it is to be paid. We affirm the court's judgment in all other respects.

¶ 108          Affirmed in part and remanded with directions.